ESTATE OF GORDON B. MCLENDON, DECEASED, GORDON B. MCLENDON, JR., INDEPENDENT EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ESTATE OF GORDON B. MCLENDON, DECEASED, DONOR, GORDON B. MCLENDON, JR., INDEPENDENT EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of McLendon v. Commissioner
Docket Nos. 20324-90, 20325-90
United States Tax Court
T.C. Memo 1993-459; 1993 Tax Ct. Memo LEXIS 469; 66 T.C.M. (CCH) 946; September 30, 1993, Filed *469 Decision will be entered under Rule 155. G was diagnosed with esophageal cancer in May 1985. Although G's condition initially improved following radiation therapy, the cancer recurred in September 1985. From October 1985 through April 1986, G received six courses of an investigational form of chemotherapy treatment. These treatments were temporarily interrupted when G attempted suicide in December 1985. Although G was found to be in "endoscopic complete remission" as of Nov. 30, 1985, the cancer again recurred in May 1986. Subsequent to the original diagnosis of cancer, G amended two family partnership agreements in which G was a general partner. In one instance, the partnership agreement was amended to allow G to transfer his partnership interest without causing the partnership to liquidate. Both partnership agreements were amended to state that upon G's death or disability, G's son, B, would have sole managerial control of the partnerships. On Mar. 5, 1986, G (as annuitant) entered into a private annuity agreement with B and the McLendon Family Trust (a trust that G established for each of his three daughters) as obligors. Under this agreement, the obligors agreed to purchase *470 a remainder interest in certain of G's assets (including G's two general partnership interests) for an annuity payable over G's lifetime. The remainder interest was valued under sec. 25.2512-5(f) (Table A), Gift Tax Regs., under which G's actuarial life expectancy was 15 years. The private annuity agreement included a so-called saving clause allowing for an adjustment to the amount to be paid to G in the event the matter is made the subject of either a settlement with the IRS or a final decision of this Court. Held, the amendments to the partnership agreements executed after G was diagnosed with cancer will not be disregarded in determining the fair market value of G's partnership interests on Mar. 5, 1986. Held, further, under the circumstances, the interests transferred by G will be valued as partnership interests as opposed to assignee interests. Held, further, G's actual life expectancy was sufficiently predictable as of Mar. 5, 1986, to require departure from the actuarial tables in computing the value of the remainder interest that G transferred pursuant to the private annuity agreement. Held, further, the saving clause included within the *471 private annuity agreement will not be respected for purposes of computing P's liability for Federal gift and estate tax. Held, further, P is not liable for additions to gift tax for delinquency and negligence. Held, further, G's retention of a life estate in the assets that were the subject of the private annuity agreement causes those assets to be included in his gross estate pursuant to sec. 2036(a), I.R.C.Held, further, P is entitled to an offset under sec. 2043(a), I.R.C., in the amount of $ 250,000. Held, further, P is not liable for additions to estate tax for negligence. For petitioner: Anderson Wallace, Jr. and Joseph O. Collins, Jr.
For respondent: James W. Lessis and Henry G. Griego. HAMBLEN
HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Chief Judge: Petitioner in this case is the Estate of Gordon B. McLendon. [1] Respondent determined a deficiency in and additions to petitioner's Federal gift tax for the taxable year 1986 as follows: Additions to Tax
Sec.
Sec.
Sec. Sec. Deficiency
6651(a)(1)
6651(a)(2)
6653(a)(1)(A)
6653(a)(1)(B)
$ 31,142,507
$ 7,785,627
[1]
$ 1,557,125
[2]
*472 Respondent now concedes that petitioner is not liable for the addition to tax under 6651(a)(2). Respondent further determined a deficiency in and additions to petitioner's Federal estate tax as follows: Additions to Tax
Sec. Sec. Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
$ 51,554,802
$ 2,577,740 50% of the interest  due on $ 51,554,802
After concessions by both parties, the issues left to be decided are: (1) The fair market value on March 5, 1986, of Gordon B. McLendon's general partnership interests in Tri-State Theaters Limited Partnership and McLendon Co.; (2) whether it was proper for Gordon B. McLendon to apply the actuarial tables set forth in section 25.2512-5(f), Gift Tax Regs., in computing the value of a remainder interest in several of his assets (including the aforementioned *473 general partnership interests) that he transferred pursuant to a private annuity agreement executed on March 5, 1986; (3) whether a so-called saving clause included in the private annuity agreement will be respected in this case; (4) whether Gordon B. McLendon's retention of a life estate in the assets that were the subject of the private annuity agreement results in the inclusion of the value of those assets in his gross estate pursuant to section 2036(a); (5) assuming the preceding issue is answered in the affirmative, the amount of the section 2043(a) offset to which petitioner is entitled; and (6) whether petitioner is liable for the various additions to tax set forth in the deficiency notices in dispute herein. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Gordon B. McLendon (Gordon or decedent) died testate on September 14, 1986, survived by four children from his marriage to Gay Noe McLendon: Gordon B. McLendon, Jr. (Bart), Kristen Margaret McLendon (Kristen), Anna Gray McLendon (Anna), and Jan McLendon Moss (Jan). At the time of his death, *474 Gordon resided in the State of Texas. Bart is the sole executor of Gordon's estate. I. General Background
Gordon had a long and successful career in the communications industry. After graduating from Yale University in 1943, Gordon served as a Japanese language officer in the U.S. Naval Intelligence Service. Between 1947 and 1952, Gordon and his father, B.R. McLendon, organized the 458-station Liberty Broadcasting System where Gordon achieved national acclaim in sports broadcasting. For the three decades from 1950 through 1980, Gordon was involved in the ownership and operation of radio and television stations as well as movie theaters throughout the United States. II. Gordon's Medical Condition
On May 6, 1985, Gordon was admitted to Methodist Hospital in Houston, Texas, complaining of hoarseness and difficulty in swallowing. Upon admission, biopsies were taken from Gordon's esophagus and he was diagnosed as having squamous cell carcinoma of the esophagus with left vocal cord paralysis. A history and physical report completed on Gordon's admission to Methodist Hospital indicates that Gordon had smoked a pack and a half of cigarettes per day for 30 years. Gordon *475 was discharged from Methodist Hospital on May 9, 1985. At that time, the physicians treating Gordon concluded that the tumor was too large to be surgically removed and that Gordon would be treated with radiotherapy on an outpatient basis. Gordon received radiation treatments from May 10, 1985, until July 18, 1985. A report entitled "Summary of Radiotherapy" states that the "patient tolerated the course of treatments well with improvement in tumor." Gordon returned to Methodist Hospital for the period August 26 through August 29, 1985. During this admission, Gordon underwent an esophagogastroduodenoscopy involving an iridium radioactive wire implant at the location of the tumor for a period of 48 hours. Gordon experienced no complications from the treatment and his condition was reported as good upon discharge. Gordon returned to Methodist Hospital on September 25, 1985, at which time additional biopsies were taken from his esophagus. The results revealed that the cancerous tumor had returned to the affected area. In early October 1985, Gordon was referred to Dr. Emil J. Freireich (Dr. Freireich) at the University of Texas M.D. Anderson Hospital and Tumor Institute (M.D. Anderson) *476 in Houston, Texas. At this time, Gordon's cancer was categorized as "systemic" -- the most severe of three categories of cancer growth. Dr. Freireich eliminated surgery as a treatment option for Gordon by virtue of damage to the affected area sustained during his prior radiation therapy, the extent of the cancerous tumor, and the belief that the cancer had spread outside the local area. In light of Gordon's condition, it was decided that he would be treated with an investigational form of chemotherapy involving a continuous infusion of 5-Fluorouracil administered concurrently with cis-platinum. While these two drugs were not in any sense considered novel agents for the treatment of cancer, the combined scheduling and dosages were unique. Dr. Freireich had administered this specific treatment regimen to fewer than 20 patients with diagnoses similar to Gordon's. Dr. Freireich characterized preliminary studies using this type of treatment on experimental animals and in patients as "promising and encouraging". More traditional treatment regimens were not considered in Gordon's case because of their very low rates of success. As an initial matter, Gordon was referred to a psychotherapist *477 to help him overcome anxiety relating to the planned chemotherapy. Thereafter, Gordon received three separate courses of chemotherapy treatment beginning on October 5, October 25, and November 27, 1985, respectively. Each treatment lasted several days. In conjunction with these treatments, Gordon received upper GI endoscopies and x rays on October 3, October 25, and November 26, 1985. Progress notes following the endoscopies performed in October 1985 indicate that cancerous cells were detected in the affected area. However, progress notes following the endoscopy performed in November 1985 state in pertinent part: IMPRESSION: The endoscopic picture is that of at least a partial remission and may actually be a complete remission, although I think this is a solid partial remission response. There is no polypoidal component or intralumenal component to the mass lesions.
A subsequent discharge summary dated December 3, 1985, and signed by Dr. Jaffer Ajani (Dr. Ajani) states in pertinent part: The patient had an esophagogastroduodenoscopy on November 26, 1985, and it showed complete endoscopic remission confirmed by multiple biopsies of the affected area.
The *478 discharge summary refers to Gordon's left vocal cord paralysis as being secondary to his esophageal cancer. In layman's terms, the endoscopic remission referred to in Dr. Ajani's report means that there was no evidence of cancer based on the biopsies (tissue samples) taken from Gordon's esophagus on November 26, 1985. Because of the chance of sampling errors, a diagnosis of complete remission based solely on an endoscopic examination does not provide the best test for determining whether the patient is free of cancer. A surgical examination of the affected area provides a stronger criterion for determining whether a particular cancer has been eradicated. Due to dangers inherent in the procedure, Gordon was not subjected to a surgical examination to confirm that his cancer was completely eradicated. On December 5, 1985, Gordon attempted suicide by shooting himself in the head with a handgun. A note written by Gordon at the time of the suicide attempt reveals that he believed that he would inevitably succumb to esophageal cancer and that he did not want to prolong the suffering of his family. Gordon was rushed to Methodist Hospital following the suicide attempt and received treatment *479 there until January 9, 1986. At the time of his discharge from Methodist Hospital, Gordon was suffering from several maladies or complications including fracture of the mandible and maxilla (jaw area), glaucoma of both eyes, immunosuppression secondary to chemotherapy, left upper lobe pneumonia, chronic obstructive lung disease, and adult respiratory distress syndrome. Upon discharge from Methodist Hospital, Gordon was directly admitted to M.D. Anderson where he received his fourth course of chemotherapy treatment. During this admission, Gordon was referred to Dr. Frank Adams (Dr. Adams), a psychiatrist, for an evaluation of his mental state. Dr. Adams' notes state in pertinent part: "Dementia evident in his simplified & economical cognitive style." On January 10, 1986, Gordon received an EEG screening at Dr. Adams's request. The EEG report states in pertinent part: IMPRESSION: This is an abnormal EEG because of (1) diffuse slowing of dominant frequency with poor activity, and (2) continuous slowing from the left hemisphere which at times appear sharp. These features suggest a primary diffuse encephalopathy such as toxic or metabolic state, as well as a secondary focal *480 defect over the left, compatible with a destructive process on that side.
(Gordon would eventually undergo two more EEG screenings on May 23 and May 27, 1986, with no change indicated from the earlier EEG report.) On January 16, 1986, Gordon was discharged from M.D. Anderson and returned home where he was examined by Dr. Barbara J. Gruebel (Dr. Gruebel) for the purpose of monitoring both his in-home care and improvement from his gunshot wound. Dr. Gruebel concluded that Gordon appeared to be doing quite well at that time. Dr. Gruebel examined Gordon at home again on January 26, 1986. It was again Dr. Gruebel's impression that Gordon was doing quite well. In early February 1986, Gordon developed a progressive confusional state and injured himself when he fell at home. Gordon was subsequently admitted to Methodist Hospital on February 7, 1986, for evaluation. After receiving treatment for flu-like symptoms, Gordon's confusional state gradually improved. On February 14, 1986 (while still at Methodist Hospital), Gordon purportedly dictated a letter to Dr. Freireich which states in pertinent part: As you might well expect, this bout with cancer has been one of the more *481 educational experiences of my life. I don't know why I thought I was immortal, but the news last May 9th that I'm not certainly got and kept my attention lo! these many months. Now that the worst is apparently over, I am beginning to make plans for the rest of my life. * * * Doctor, it occurs to me that the first thing I need in making these plans is a frank assessment of my physical condition. I know that I am better. I can feel that much. My swallowing is now normal. I no longer feel the tumors at all. My general overall condition, at least from my standpoint, seems to be improving (present circumstances notwithstanding), although I would be less than truthful if I didn't tell you that I still find the chemotherapy treatments very, very, debilitating. Still, that is a small price to pay for the improvement of my carcinoma. You and your staff have told me that my cancer is in total remission. 1) Does that mean that I am cured? 2) What is my prognosis for the future? 3) Can I make long-term plans? * * * Best personal regards, Gordon McLendon
GBM:bpo (Dictated but not signed) [2]
*482 Upon discharge from Methodist Hospital on February 18, 1986, Gordon was again directly admitted to M.D. Anderson. A radiologic report dated February 18, 1986, indicates that Gordon had fractures of the right fourth and fifth ribs, apparently resulting from his fall at home earlier in the month. Further, a "Problem List" dated that same day includes three entries as follows: 1. Alteration in Thought Processes re: Physiologic Changes 2. Potential for Injury re: Impaired Judgment 3. Self Care Deficit re: Perceptual Impairment
Gordon received his fifth course of chemotherapy treatment during the period February 19 through February 25, 1986. Dr. Freireich wrote a letter to Gordon dated February 19, 1986, which states in pertinent part: Dear Mr. McLendon: Thank you for your letter dated February 14, 1986. Like you, I am personally encouraged by the marvelous progress you are making toward our common goal of complete physical and mental recovery from the impact of the malignancy and its treatment. As we discussed before we initiated chemotherapy for your cancer of the esophagus, the treatment we had prescribed is of recent development. In fact, the results *483 in our clinic were limited to less than 20 patients who had previously been treated with a diagnosis similar to yours. Other centers in the country have similar closely related programs and their experience is additive to ours. As we have told you, our results for the early control of this malignancy have been most promising. In your instance, because of the previous radiation therapy, our expectations for truly effective control were even lower. Nonetheless, we are all extremely positively impressed with the favorable response that your cancer has shown under chemotherapy. In fact, we are so encouraged, that you and I have discussed on previous occasions, a surgical procedure to document the existence of total eradication of the disease. At the present time, I am advising against such a surgical procedure primarily because the extent of the operation would result in substantial morbidity and because of the risk to adjacent vital organs such as the larynx and the trachea (windpipe). Moreover, even if such an operation was undertaken, it would assure that recurrence in the esophagus would not occur, but it would not assure us that the tumor had not already spread to sites outside *484 of the operating field. Therefore, we do not feel that the operation is indicated. The objective evidence that we have has failed to demonstrate any residual disease. This includes endoscopy with biopsies of the esophagus which have proven to be negative on several occasions and the repeated x-ray examinations by CT scan which fail to reveal any evidence of residual malignancy. I therefore must state that by clinical and laboratory objective criteria, the present condition of your illness must be characterized as "complete remission". The word remission is used advisably because the risk of recurrence is still much in the picture. On the other hand, patients who are cured of their disease are exclusively drawn from the population of patients who have a "complete remission". To state that positively, you are certainly a candidate for long term control which fulfills the medical and lay criteria for curability. Unfortunately the maturity and the quantity of our clinical data does not permit good estimates of the risk of a recurrence in your specific instance. It is therefore necessary for me as a physician, to advise you of the risk that the disease might recur, but to state *485 frankly and without hesitation that the possibility that your disease has been permanently eradicated is definite and significant and in my professional opinion, should form the basis for your planning for the future. Sincerely, Emil J. Freireich, M.D., D.Sc. (Hon.)
Gordon was discharged from M.D. Anderson on February 25, 1986, and returned home where he received 24-hour care from a staff of private duty nurses. Notes taken by these nurses during the period March 2 through March 5, 1986, show that while Gordon was able to take short walks and perform minor tasks, he was at times sick to his stomach, was in constant need of pain medication, and spent the vast majority of his time in bed. Gordon was suffering from mouth sores during this period and was receiving artificial sustenance to ensure proper caloric intake. Gordon expressed concern that in the absence of artificial sustenance, he would not be able to eat enough to sustain himself. Gordon was examined by Dr. Gruebel on March 5, 1986. At this time, it was Dr. Gruebel's impression that Gordon was "markedly improved" and in the best physical condition since coming under her care. A significant portion of Dr. Gruebel's *486 notes of the examination are devoted to a discussion of the need to increase Gordon's oral intake of food and to wean him off artificial sustenance. Gordon was admitted to M.D. Anderson for his sixth and final course of chemotherapy treatment on March 26, 1986. Gordon was discharged following the treatment on April 1, 1986. On May 7, 1986, Gordon was admitted to Methodist Hospital where he underwent a fiberoptic bronchoscopy which revealed a suspected recurrence of his esophageal cancer. The recurrence of the cancer was confirmed through an upper GI endoscopy performed at M.D. Anderson on May 13, 1986. Gordon was subsequently treated with interferon. The informed consent form signed by Gordon and Bart states in pertinent part: The purpose of this experimental study is to evaluate the safety, tolerance and efficacy of recombinant tumor necrosis factor and recombinant human interferon-gamma in the treatment of disseminated cancer.
The interferon treatments were discontinued after Gordon experienced episodes of confusion. A progress note written by Dr. Adams and dated May 23, 1986, states in pertinent part: As discussed with Dr. Freireich, neuropsychiatry has nothing *487 further to offer in this case. Pt. and primary physician wish us to not examine the pt. and I cannot possibly allow this standard of suicidal practice to exist in my Section. I am signing off the case. If family wishes psychiatric care, we will be pleased to assist referral.
Gordon was discharged from M.D. Anderson on May 30, 1986. Gordon's discharge instructions provided for in-home palliative treatment with infusions of 5-Fluorouracil. Gordon died at home on September 14, 1986. From the time he was first admitted to M.D. Anderson in October 1985, until his death, Gordon survived longer than 75 percent of patients diagnosed with esophageal cancer. III. The Partnerships
A. Tri-State Theaters Limited Partnership
1. Formation, Ownership, and Operations
By partnership agreement dated December 10, 1981, Gordon and Bart as general partners joined with B.R. and Jeanette McLendon (Gordon's parents and Bart's grandparents) as limited partners to form a Texas limited partnership known as Tri-State Theaters (Tri-State). The limited partnership was formed as a result of a restructuring of a general partnership that had been owned by the McLendon family since *488 the 1930's. At the time the limited partnership was formed, partnership interests were held as follows: General Partners
Interest
Gordon
30 percent
Bart
10 percent
Limited Partners
B.R.
30 percent
Jeanette
30 percent
B.R. and Jeanette died on October 11, 1982, and July 25, 1985, respectively. Following their deaths, their estates elected to retain their interests in Tri-State. On March 5, 1986, partnership interests in Tri-State were held as follows: General Partners
Interest
Gordon
30 percent
Bart
10 percent
Limited Partners Estate of B.R. McLendon
30 percent
Estate of Jeanette McLendon
30 percent
The Tri-State partnership agreement allowed for Tri-State to engage in a broad range of business activities including movie theater operations, real estate development, oil and gas exploration and development, and investment in stocks, bonds, and other securities. During 1986, Tri-State's principal business activities were limited to the leasing of real estate for drive-in theater operations and the management of its investments. Its principal assets consisted of real estate and marketable securities. As of 1986, Gordon had withdrawn from *489 active management of Tri-State and Bart assumed more responsibility in this regard. Tri-State had no employees of its own and relied on the staff of an affiliate, the McLendon Co., for administrative assistance. 2. Transfer Restrictions
Article IX of the original Tri-State limited partnership agreement sets forth restrictions on the transfer of an interest in the partnership. Article IX, paragraph 9.02, states in pertinent part: Permitted Assignments. The following assignments and transfers may be made: (a) any Partner may make a testamentary transfer of all or any part of his interest in the Partnership to any individual, entity or trustee; provided, in the case of a testamentary transfer of a general partnership interest, such testamentary transfer shall be subject to paragraph 9.04 of this Article;
Article IX, paragraph 9.04, states in pertinent part: Option. If a General Partner or Limited Partner attempts to dispose of all or any part of his interest, or if by court decree or otherwise, another person acquires any part of his interest in the Partnership, such an event will be considered an event of default by a Partner. Furthermore, the passing *490 of a General Partner's interest in the Partnership to the General Partner's legal representative upon his death shall be treated as an event of default for purpose of this paragraph 9.04. Upon the occurrence of an event of default, the General Partners (or if the defaulting party is a General Partner, the other General Partner) shall have the right, at their election, * * * to purchase such interest in the Partnership * * *. The purchase price to be paid to the Seller shall be paid in cash. If the option contained in this Paragraph 9.04 is exercised, the purchase price to be paid to the Seller shall be an amount equal to the then existing book balances, as of the date of such default, of the income account and capital account of the Defaulting Interest.
Article X of the Tri-State limited partnership agreement states that the partnership will dissolve and liquidate upon the occurrence of certain events. Article X, paragraph 10.01(c), states in pertinent part: Dissolution and Liquidation. The Partnership shall be dissolved and shall liquidate upon the occurrence of any of the following: * * * * (c) The death of Gordon B. McLendon, bankruptcy of Gordon B. McLendon *491 * * *, insanity of Gordon B. McLendon * * *, or the assignment or encumbrance of Gordon B. [McLendon's] interest in violation of this Agreement.
Article XI of the Tri-State limited partnership agreement states that the agreement may be amended from time to time by agreement of a majority in interest of the general and limited partners. 3. Amendments to the Tri-State Limited Partnership Agreement
On May 30, 1985, Gordon and his mother, Jeanette, executed amendments to the Tri-State limited partnership agreement. In particular, the second sentence of article IX, paragraph 9.04, was amended to provide that the passing of a general partner's interest to his legal representatives upon his death would not be treated as an event of default. Further, article X, paragraph 10.01(c) (providing for the dissolution and liquidation of the partnership upon Gordon's death, bankruptcy, or insanity, or upon an assignment of his partnership interest in violation of the agreement), was deleted from the agreement in its entirety. Bart was initially unaware that the Tri-State agreement had been amended in this fashion. On August 23, 1985, Gordon and Bart executed further amendments to *492 the Tri-State limited partnership agreement. Gordon and Bart executed the amendments both as general partners and as the legal representatives of the estates of B.R. and Jeanette McLendon. Article VII, paragraph 7.01, and all related provisions of the original limited partnership agreement were amended to state that, upon Gordon's death or disability, Bart would have sole and exclusive management, supervision, and control of the partnership and its assets. In addition, new paragraph 7.06 was added to the agreement, stating that Bart would have the authority to expel from the partnership any partner who might institute legal proceedings against him or otherwise contest his managerial decisions. Finally, article X, paragraph 10.01, of the original limited partnership agreement was amended to add new subsection (c), which states: (c) Except as hereinabove provided, each Partner hereby irrevocably waives the power to dissolve and terminate the Partnership and the right to seek a court decree of dissolution and termination and/or partition of the Partnership assets.
B. The McLendon Co.
1. Formation, Ownership, and Operations
By partnership agreement dated November *493 20, 1972, Gordon and his parents, B.R. and Jeanette, joined as general partners to form a Texas general partnership known as the McLendon Co. (McLendon Co.). The partnership was formed in part for the purpose of assuming the business theretofore conducted by McLendon Corp., a Texas corporation then in liquidation. In this regard, the original partnership agreement states that McLendon Co. would be capitalized through a transfer of substantially all of the assets of McLendon Corp. Prior to its liquidation, the McLendon Corp. was engaged in the operation of radio stations and movie theaters. The original McLendon Co. partnership agreement states that responsibility for the management of McLendon Co. would rest with B.R. and Gordon. McLendon Co. had four employees including an accountant, two clerks, and a secretary. During the period in question, McLendon Co. operated primarily as an investment company holding real estate, ancient coins, antiquities, and short-term money market funds. Income consisted primarily of rental income from the leasing of real estate for the operation of drive-in movie theaters as well as interest and dividend income. McLendon Co. owned a six-screen *494 drive-in movie theater facility in Houston, Texas, the buildings and equipment associated with six other drive-in movie theaters in Houston, Dallas, and El Paso, Texas, and an indoor movie theater in Dallas, Texas. McLendon Co. leased these movie theaters to FLW Theatre Co. (FLW) which had complete responsibility over operations. McLendon Co. also owned a number of antiques and artifacts consisting of ancient Sumerian clay tablets and Mesopotamian, Assyrian, Babylonian, and Akkadian cylinder stamp seals, ancient statues, and oriental carpets and rugs. McLendon Co. held minority interests in tax oriented limited partnerships and a leasehold interest for the use of an undeveloped island off the coast of Australia. At the time of the formation of the partnership, the partners' interests in the capital and net profits and losses of the partnership were as follows: Partner
Interest
B.R.
50 percent
Gordon
49 percent
Jeanette
1 percent
2. Transfer Restrictions
Section 6 of the original McLendon Co. partnership agreement states in pertinent part: The managing partners shall be B.R. McLendon and Gordon B. McLendon. Jeanette McLendon shall have no voice in the *495 management of the partnership business and need devote no time thereto. * * * No partner shall, except with the consent of the other partners, assign, mortgage, grant a security interest in, or sell his share in the partnership or in its capital assets or property, or enter into any agreement as a result of which any person shall become interested with him in the partnership.
Sections 9 and 10 of the McLendon Co. partnership agreement set forth the procedures to be followed upon the retirement or death of a partner. In the case of the retirement of a partner, the remaining partners may either purchase the retiring partner's entire interest at a price equal to the retiring partner's capital account as shown on the partnership books or terminate and liquidate the partnership. In the case of the death of a partner, the remaining partners may either purchase a proportionate share of the deceased partner's entire interest at a price equal to the deceased partner's capital account as shown on the partnership books, terminate and liquidate the partnership, or continue the partnership with the successor in interest of the deceased partner. 3. Transactions Affecting Ownership
*496 Following the deaths of B.R. and Jeanette in October 1982 and July 1985, respectively, the partnership continued with the successors in interest of each of their estates. As a consequence of a division of the interests of B.R. and Jeanette pursuant to the community property laws of Texas, each estate held a 25.5-percent interest in McLendon Co. In August 1985, Gordon assigned a 3-percent interest in the McLendon Co. to his son, Bart. [3] There is no indication in the record that the remaining partners, specifically the estates of B.R. and Jeanette McLendon, formally consented to the assignment to Bart. 4. Amendments to the McLendon Co. Partnership Agreement
On August 23, 1985, Gordon and Bart executed amendments to the McLendon Co. partnership agreement that in substance mirrored *497 the amendments to the Tri-State partnership agreement adopted the same day. Again, Gordon and Bart executed the amendments both as general partners and as the legal representatives of the estates of B.R. and Jeanette McLendon. The amendments state in pertinent part: In order to provide strong, effective, consistent management for and thereby protect and preserve the assets of THE MCLENDON COMPANY, * * * the undersigned, being all of the current partners of the Partnership and having agreed and hereby agreeing, pursuant to Section 10 of the Partnership Agreement, to continue the Partnership with the successors in interest of B.R. McLENDON and JEANETTE McLENDON, both deceased, do hereby amend the Partnership Agreement as follows: I. Section 6 of the Partnership Agreement is hereby amended as follows: A. The first two sentences of such Section 6 are hereby deleted in their entirety and there is hereby substituted for such deleted sentences the following sentences: "Upon the death or disability of Gordon B. McLendon, the sole and exclusive managing partner of the partnership shall be GORDON B. McLENDON, JR., who, acting alone and in his full and complete discretion, shall *498 have the sole and exclusive right to manage the partnership and the partnership business. No other partner shall either have a voice in the management of a partnership business or be required to devote any time thereto * * *.
B. There shall be added to such Section 6 a second paragraph which shall read as follows: "Should any partner contest by legal action, judicial proceeding or otherwise any management decision or action made or taken by the managing partner in his role as sole and exclusive manager of the partnership business, then the managing partner may, by written notice to such partner * * * expel such partner from the partnership, such expulsion and the termination of such partner's status as a partner in the partnership being effective as of the date of the Expulsion Notice. No such expulsion shall cause a dissolution and termination of the Partnership and, upon any such event, no one shall have the right to compel the termination and liquidation of the Partnership.
Further, the McLendon Co. partnership agreement was amended to state that each partner irrevocably waived the power to dissolve and terminate the Partnership as well as the right to seek a court *499 decree for that purpose. C. Janet Pallas
Janet Pallas (Pallas), an accountant, began preparing partnership returns for Tri-State and McLendon Co. in 1983 while employed as a manager with Peat Marwick Mitchell. Pallas was hired by Tri-State and McLendon Co. in December 1985. During this period, Pallas also represented Bart, Anna, and Kristen and was privy to the details surrounding the family's financial and business matters. Pallas presently serves as chief financial officer for both Tri-State and McLendon Co. Pallas was present at a meeting in August 1985, during which some of the previously described amendments to the Tri-State and McLendon Co. partnership agreements were adopted. Pallas believed that the amendments were adopted for the primary purpose of ensuring that the partnerships would continue in an orderly fashion with Bart firmly in control. From Pallas' perspective, the amendments reflected Gordon's concern that his daughters did not possess the business acumen needed to manage the partnerships. Pallas was also aware that Gordon's daughters had caused discord within the family by bringing a lawsuit against their maternal grandparents' estates. Finally, Pallas *500 believed that Gordon was concerned that the executors named in his mother's will, including his former wife, were not prepared to act in the best interests of the partnerships. IV. Last Will and Testament
Gordon executed his last will and testament on October 24, 1985, naming Bart independent executor. [4] The will states in pertinent part: SECTION II I direct that all of my automobiles, clothing, jewelry, objects of art, china, linens, furniture, silverware, and all other purely personal effects and tangible personal property owned by me shall be divided by my executor among my children and lineal descendants, in such proportions (and to the total or partial exclusion of one or more members of such group should my executor so determine) and on such terms and conditions as my executor may in his sole discretion determine. I give and assign my membership in the Dallas Country Club, Dallas, Texas, to my son, GORDON B. McLENDON, JR., but if he is not living at that time, then to his eldest living son. *501 SECTION III I give, devise and bequeath the following: (a) To Billie P. Odom, the sum of $ 750,000.00 * * *. If she does not survive me, this bequest shall pass to her children and lineal descendants, per stirpes. (b) To my sister, Marie McLendon May Wheeler, if she survives me, the sum of $ 250,000.00 * * *. If she does not survive me, this bequest shall pass to her children and lineal descendants, per stirpes. SECTION IV Four-fifths (4/5) of the rest and residue of my estate of every character and description, and wheresoever situated, shall be distributed for the uses and purposes and subject to the terms, provisions and limitations hereinafter set forth: (a) These assets shall be divided into four equal parts, and, if necessary also an equal part for the descendants, taken collectively, of any child of mine who shall have predeceased me. One part shall be distributed to my son GORDON B. McLENDON, JR. outright and free of trust. The remaining three parts shall be designated by the name of each daughter of mine and shall be held in a separate and distinct trust and administered for the benefit of that child and her lineal descendants, or if a daughter is not surviving, *502 then for the benefit of her lineal descendants. Each trust shall be held and administered by GORDON B. McLENDON, JR. as Trustee. (b) The Trustee shall distribute at his sole discretion to each of my daughters in whose name a trust is created, and the descendants of such child, so much of the net income and corpus of that trust as the Trustee determines necessary for her support and maintenance in the station in life and the standard of living to which she has become accustomed during my lifetime, and in any event, to maintain and support her in health, including medical, dental, hospital and nursing expenses, and expenses of invalidism, taking into consideration, however, all other sources of income which she may or should have. (c) Each trust shall terminate and be distributed to that child upon the following dates: one-fourth (1/4) of each child's trust, including accumulated income and corpus, upon the death of GBM or in any event not later than two (2) years after the date of death; one-third (1/3) of the remaining assets in each trust shall be distributed to that child seven (7) years after the date of death; one-half (1/2) of the remaining assets in each trust shall be distributed *503 to that child twelve (12) years after the date of death; and all the remaining assets in each trust shall be distributed to that child seventeen (17) years after the date of death. * * * * SECTION V The remaining one-fifth (1/5) of the rest and residue of my estate of every character and description, and wheresoever situated, shall be held in trust for the uses and purposes and subject to the terms, provisions and limitations hereinafter set forth: (a) This portion of my estate shall be divided into as many equal parts as there are children of mine living at my death, and also an equal part for the descendants, taken collectively, of any child of mine who shall have predeceased me. Each of said parts shall be designated as the children's trust of each child of mine and shall be held as a separate and distinct trust and administered for the benefit of the children of each of my children and for said grandchild's lineal descendants. Each of said trusts shall be held and administered by GORDON B. McLENDON, JR. as Trustee.
Section IX of the will states that if a beneficiary contests the will or otherwise attempts to attack, modify, or impair its validity, that beneficiary's *504 sole inheritance from Gordon's estate will be $ 1 in lieu of any other provision made for that beneficiary under the will. V. Private Annuity Agreement and Related Transactions
A. The Private Annuity Agreement
On March 5, 1986, Bart (as both grantor and trustee) executed an irrevocable trust agreement entitled the McLendon Family Trust Agreement (McLendon Family Trust). The trust agreement establishes a separate and distinct trust for each of Gordon's three daughters: Jan, Kristen, and Anna. Mandatory and discretionary distributions from the trusts are in all material respects identical to the distribution scheme set out in section IV of Gordon's last will and testament. The trust agreement names MBankDallas, N.A. (MBank), as successor trustee in the event that Bart is unable to serve as trustee. Like section IX of Gordon's will, article X, paragraph H, of the trust agreement states that if any of the beneficiaries contests Bart's authority or institutes any type of legal action against Bart, the beneficiary's rights under the trust will immediately lapse and transfer to the remaining beneficiaries. On March 5, 1986, Gordon, as annuitant, entered into a private *505 annuity agreement with Bart (individually) and the McLendon Family Trust as obligors. Specifically, Gordon agreed to transfer a remainder interest in certain of his assets to the obligors in consideration for the obligors' promise to pay Gordon $ 250,000 at the time of the execution of the agreement, with the balance of the agreed purchase price to be paid in annual installments on the anniversary date of the agreement for the rest of Gordon's life. Under the agreement, 25 percent of the remainder interest would be purchased and owned outright by Bart individually, and 75 percent of such remainder interest would be purchased and held by the McLendon Family Trust for the benefit of Gordon's daughters. Exhibit A attached to the private annuity agreement lists the assets subject to the agreement as follows: (1) A 30-percent general partnership interest in Tri-State; (2) a 46-percent general partnership interest in McLendon Co.; (3) all of the outstanding shares of Gordon B. McLendon, Inc.; (4) 20 acres, more or less, of undeveloped land situated in Denton County, Texas; and (5) all of Gordon's rights in the McLendon Co. pension plan. Exhibit A establishes a deadline of July 1, 1986, *506 for the appraisal of the assets listed therein. The private annuity agreement includes a paragraph allowing for a future adjustment to the amount to be paid to Gordon as follows: The parties hereto recognize that the valuation of many of the assets set out on attached Exhibit A are, by their nature, as determined by the best judgement of the parties and independent consultants engaged to assist in the valuation process and may be subject to differing opinions. Therefore, the parties agree that, to the extent any of the values on the attached Exhibit A are changed through a settlement process with the Internal Revenue Service, or a final decision of the United States Tax Court, the purchase price hereunder shall be adjusted accordingly, with interest on said adjustment at the rate of ten percent (10%) from the date hereof until said final determination of value, and the annuity payments due and payable hereunder shall likewise be adjusted to reflect any such change in valuation.
The private annuity agreement was amended June 30, 1986, to extend the deadline for the appraisal of the assets in question to September 30, 1986. The amendment was signed by Bart as attorney in fact *507 for Gordon, as trustee of the McLendon Family Trust, and in his individual capacity. B. The Annuity Computation
The parties to the private annuity agreement assigned an aggregate value of $ 18,362,970 to the five assets listed in exhibit A. Gordon's partnership interests in Tri-State and McLendon Co. were valued at $ 9,500,000 and $ 4,200,000, respectively. The record does not reflect the specific values assigned to the remaining three assets. Gordon was 65 years old on March 5, 1986, giving him an actuarial life expectancy of 15 years on the date the private annuity agreement was executed. The amount to be paid to Gordon under the private annuity agreement was calculated by first computing the present value of a remainder interest in the assets in question. This was accomplished by multiplying $ 18,362,970 (the value assigned to the assets listed in exhibit A) by .32030 (the factor prescribed by section 25.2512-5(f) (Table A), Gift Tax Regs., to compute the present worth of a remainder interest at age 65). Next, the product, $ 5,881,695, was divided by 6.7970 (the factor prescribed by section 25.2512-5(f) (Table A), Gift Tax Regs., to compute the present worth of an *508 annuity at age 65) to arrive at an annual payment of $ 865,332. C. Financing and Related Correspondence
On March 6, 1986, Anderson Wallace, Jr. (Bart's attorney), advised James M. Spellings (Spellings) of MBank that in his opinion Bart was capable of borrowing funds from the McLendon Co. in order to fund the private annuity agreement. By letter dated March 14, 1986, Spellings notified Bart that MBank had approved his request for a loan on behalf of the McLendon Family Trust in the amount of $ 1,125,000 for the purpose of acquiring a remainder interest in Gordon's assets. By letter of the same date, Spellings notified Bart that he would receive a loan of $ 375,000 in his individual capacity for the same purpose. By letter dated July 3, 1986, Bart wrote to Spellings regarding the repayment of a loan the proceeds of which were used to satisfy Bart's one-quarter share of the $ 250,000 paid to Gordon at the time the private annuity agreement was consummated. The letter states in pertinent part: At this time, I desire to pay the principal balance, $ 62,500.00, of note number 149041. As you know, this note relates to certain estate planning undertaken earlier this year involving *509 my purchase of a remainder interest in my father's assets. Since the purchase is essentially, in lieu of my receiving an inheritance upon my father's death, the note is a separate obligation on my part. Accordingly, Jim, I am directing you to debit my separate funds in satisfaction of the obligation. * * *
On or about September 8, 1986, Bart and the McLendon Family Trust transferred $ 600,000 to Gordon. D. Gordon's Federal Income Tax Return
Gordon's final Federal income tax return (for the short year ending September 14, 1986) was filed on October 14, 1987, pursuant to an extension. The return reflects a total tax liability of $ 1,493,848, including tax on ordinary income and long-term capital gain attributed to the above-described private annuity transaction. [5]
*510 VI. Probate Proceedings
Shortly after Gordon's death in September 1986, Bart and Anderson Wallace, Jr., attended a meeting in Newport Beach, California, with Bart's three sisters and their attorney, Don Killian. Bart called the meeting after learning that his sisters were preparing to institute legal proceedings in an effort to force Tri-State and McLendon Co. to liquidate. Bart hoped to avoid such litigation by explaining to his sisters why their father had planned his estate as he did. The meeting in Newport Beach proved unsuccessful for shortly thereafter Anna and Jan brought an action against the Estate of Jeanette McLendon, McLendon Co., and Tri-State in the Probate Court of Dallas County, Texas. The action was brought to contest the validity of the August 23, 1985, amendments to the Tri-State and McLendon Co. partnership agreements. In its judgment signed November 5, 1991, the probate court ruled in pertinent part that: (1) The McLendon Co. did not dissolve upon the death of Jeanette McLendon and that there are no other grounds for its dissolution; and (2) the August 23, 1985, amendments to the Tri-State and McLendon Co. partnership agreements are valid. (At the *511 time this matter was submitted to the Court, the judgment of the probate court was on appeal. In its judgment entered August 17, 1993, the Texas Court of Appeals (an intermediate appellate court) affirmed the probate court respecting the validity of the partnership amendments). VII. Petitioner's Federal Estate Tax Return
Petitioner filed its Federal estate tax return (Form 706) on or about June 11, 1987, reporting a total gross estate of $ 3,554,390 and deductions of $ 1,704,791, leaving a taxable estate of $ 1,849,599. [6] Adjusted taxable gifts of $ 355,220 are reported in the return. The total gross estate figure is derived from the total of the items listed on Schedule C (mortgages, notes, and cash), Schedule D (insurance on the decedent's life), and Schedule F (other miscellaneous property) attached to the return. The most significant item included within the total gross estate figure is $ 3,287,875 listed as a receivable *512 from McLendon Co. under Schedule C. The return also includes Schedule I (annuities) which states in pertinent part: Decedent was receiving private annuity payments from his four children prior to his death. These payments terminated on decedent's death and no further payments were paid or were payable to any other person or beneficiary.
The value of the annuity on the date of death is reported as zero. Deductions against the total gross estate are derived from the total of the items listed on Schedule J (funeral expenses and expenses incurred in administering property subject to claims) and Schedule K (debts of the decedent, and mortgages and liens) attached to the return. Schedule K indicates that Gordon owed $ 100,471 each to Bart and the three individual trusts established under the McLendon Family Trust reflecting overpayments of principal and interest under the private annuity agreement. VIII. Deficiency Notices
A. Deficiency Notice (Gift Tax)
Respondent determined a deficiency in and additions to petitioner's Federal gift tax for the 1986 taxable year. The deficiency in gift tax is attributable to respondent's determination that the private annuity *513 transaction was in substance part sale and part gift. The deficiency notice states in pertinent part: (A) It is determined that on or about March 5, 1986, the decedent made transfers which are subject [to] the gift tax as follows:
Property Transferred:
30-percent general partnership interest
in Tri-State Theaters, a limited partnership
$ 43,940,952
46-percent general partnership interest
in the McLendon Co., a general partnership
11,375,516
1,000 shares of Gordon McLendon, Inc.
200,000
20 acres of real property in Denton County,
Texas 280,000
Decedent's interest in the McLendon Co.
Pension Trust
4,182,970
Less:
Value of retained life estate
$ 2,726,335
Consideration paid by donees
250,000
Value of Gift
$ 57,003,103
It is further determined that no exclusions are allowable since the transfer were of a future interest. Accordingly, the amount of taxable gifts is $ 57,003.103. A portion of the gift tax deficiency is also attributable to respondent's determination that Gordon made prior taxable gifts of $ 873,754. In particular, respondent determined that the fair market value of the 3-percent general partnership interest in McLendon Co. that Gordon transferred *514 to Bart in August 1985 was $ 873,754, rather than $ 355,220 as reported by Gordon on his Federal gift tax return for the calendar year ending December 31, 1985. [7]
Respondent now contends that as of March 5, 1986, the aggregate fair market value of the assets that were the subject of the private annuity agreement was $ 51,562,970. This lower figure is attributable to a reduction in the values assigned to the Tri-State and McLendon Co. partnership interests to $ 37,800,000 and $ 9,100,000, respectively. On the other hand, respondent stands by the values determined in the deficiency notice with respect to the Gordon McLendon, Inc. stock, the 20 acres of land, and Gordon's interest in the McLendon Co. pension trust. Petitioner has presented no evidence to counter respondent's determination with respect to these latter three items, and thus petitioner is deemed to have conceded those values. In determining *515 the value of the taxable gift resulting from the private annuity transaction, respondent proposes to subtract from $ 51,562,970 the value of the life estate that Gordon retained in the assets, as well as the $ 250,000 paid to Gordon at the time the transaction was consummated. Relying on the views articulated by her medical and actuarial experts, respondent contends that the value of Gordon's life estate should be determined by computing the value of an income interest in $ 51,562,970 for a term certain of .65 years. Petitioner does not contest respondent's determination that the remainder interest transferred pursuant to the private annuity transaction is properly characterized as a future interest. Consequently, if respondent's position is sustained, petitioner is not entitled to exclude any portion of the resulting gift under section 2503(b). B. Deficiency Notice (Estate Tax)
As indicated, respondent also determined a deficiency in and additions to petitioner's Federal estate tax. The deficiency in estate tax is based on respondent's determination that: (1) Petitioner failed to report as part of the gross estate the $ 250,000 paid to Gordon concurrently with the execution *516 of the private annuity agreement; (2) the private annuity transaction resulted in a transfer properly included in Gordon's gross estate pursuant to section 2036(a) with a resulting offset under section 2043(a) in the amount of $ 250,000; (3) petitioner is not entitled to a funeral expense deduction claimed with respect to $ 2,627 paid to Colter's Barbecue; (4) petitioner is not entitled to deductions for amounts purportedly overpaid under the private annuity agreement or for Gordon's 1986 income tax liability; and (5) petitioner understated adjusted taxable gifts on the ground that Gordon understated the fair market value of the 3-percent general partner interest in the McLendon Co. that he transferred to Bart in August 1985. [8]
Respondent now fully concedes *517 items 1 and 3 listed above. With respect to item 4, respondent now concedes that petitioner is entitled to a deduction from the gross estate of $ 401,884 reflecting amounts overpaid under the private annuity agreement. With respect to item 5, respondent concedes that the correct value of the 3-percent general partnership interest transferred to Bart is $ 479,568, reducing the proposed increase in adjusted taxable gifts to $ 124,348. [9]
IX. Stipulated Values
The parties have stipulated several alternative values for Gordon's Tri-State and McLendon Co. partnership interests as of March 5, 1986, and September 14, 1986. A. Tri-State
Assuming that a transferee of Gordon's interest in Tri-State is treated as having received a partnership interest and that the 1985 amendments to the partnership agreement are respected, the parties agree that there are *518 three alternative bases for computing the value of the interest: The expulsion scenario, the default scenario (rights exercised), and the default scenario (rights not exercised). Under the expulsion scenario, a partner expelled pursuant to article 7.06 of the partnership agreement as amended August 23, 1985, is to be paid the existing book value of his income and capital account. Payment will be made in 10 equal installments at an annual rate of 10 percent. Under this approach, the fair market value of Gordon's interest in Tri-State on March 5, 1986, and September 14, 1986, is $ 3,600,000. Under the default scenario (rights exercised), a defaulting partner under article 9.04 of the partnership agreement as amended May 30, 1985, is to be paid the book value of his income and capital accounts as of the date of default. Under this approach, the fair market value of Gordon's interest in Tri-State on March 5, 1986, and September 14, 1986, is $ 5,900,000. Under the default scenario (rights not exercised), a defaulting partner is entitled to sell his interest at fair market value if the remaining partners do not exercise their rights under article 9.04 of the partnership agreement as *519 amended May 30, 1985, to purchase the interest at book value. Under this approach, the fair market values of Gordon's interest in Tri-State on March 5, 1986, and September 14, 1986, are $ 13,400,000 and $ 12,800,000, respectively. Assuming that a transferee of Gordon's interest in Tri-State is treated as having received an assignee interest (as opposed to an outright partnership interest), the parties agree that the fair market value of Gordon's interest in Tri-State on March 5, 1986, and September 14, 1986, is $ 3,600,000. Assuming that the amendments to the Tri-State partnership agreement are not respected for purposes of applying the Federal estate or gift tax and that the Court finds that a transferee of Gordon's interest would have the right to liquidate the partnership, the parties agree that the fair market values of Gordon's interest in Tri-State on March 5, 1986, and September 14, 1986, are $ 37,800,000 and $ 36,200,000, respectively. B. McLendon Co.
Assuming that a transferee of Gordon's interest in McLendon Co. is treated as having received a partnership interest and that the August 23, 1985, amendment to the partnership agreement is respected, the parties agree *520 that there are four alternative bases for computing the value of the partnership interest: The expulsion scenario, purchase rights exercised scenario, purchase rights not exercised scenario, and sale to a third party scenario. Under the expulsion scenario, a partner expelled pursuant to section 6 of the partnership agreement as amended August 23, 1985, is to be paid the existing book value of his income and capital account. Payment will be made in 10 equal installments at an annual rate of 10 percent. Under this approach, the fair market values of Gordon's interest in McLendon Co. on March 5, 1986, and September 14, 1986, are $ 3,900,000 and $ 3,800,000, respectively. Under the purchase rights exercised scenario, the retirement or death of a partner leaves the remaining partners with the right to purchase that partner's interest for an amount equal to the partner's capital account, increased by his share of partnership profits or decreased by his share of partnership losses for the particular year. The purchase price is to be paid without interest in 4 semi-annual installments beginning 6 months after the date of retirement/death. Under this approach, the fair market values *521 of Gordon's interest in McLendon Co. on March 5, 1986, and September 14, 1986, are $ 5,600,000 and $ 5,500,000, respectively. Under the purchase rights not exercised scenario, the managing partner is permitted to either terminate and liquidate the partnership or continue the partnership with a successor in interest of a retiring or deceased partner in the event the remaining partners do not exercise their right to purchase the interest of the retiring/deceased partner. Under this approach, the fair market value of Gordon's interest in McLendon Co. on March 5, 1986, and September 14, 1986, is $ 9,100,000. Under the sale to a third party scenario, a partner may sell his interest in the partnership with the consent of the remaining partners pursuant to section 6 of the original McLendon Co. partnership agreement. Under this approach, the fair market value of Gordon's interest in McLendon Co. on March 5, 1986, and September 14, 1986, is $ 5,100,000. Assuming that a transferee of Gordon's interest in McLendon Co. is treated as having received an assignee interest (as opposed to an outright partnership interest), the parties agree that the fair market values of Gordon's interest in *522 McLendon Co. on March 5, 1986, and September 14, 1986, are $ 3,900,000 and $ 3,800,000, respectively. X. Medical Experts
The parties filed expert reports and presented expert testimony concerning Gordon's physical condition and actual life expectancy on March 5, 1986. A. Dr. Freireich
Dr. Freireich prepared an expert report evaluating Gordon's physical condition both prior and subsequent to March 5, 1986. Dr. Freireich testified on petitioner's behalf at trial. Dr. Freireich earned his M.D. degree from the University of Illinois College of Medicine in 1949. Since 1965, Dr. Freireich has served as internist and professor of medicine at the University of Texas M.D. Anderson Cancer Center in Houston, Texas. From 1973 through 1981, Dr. Freireich served as the chief of the oncology division at the University of Texas Medical School in Houston, Texas. In Dr. Freireich's opinion, the cure rate for a cancer patient with Gordon's medical history as presented in October 1985, i.e., locally recurrent cancer following radiation therapy, would be approximately 2 to 3 percent. However, in light of Gordon's favorable response to the investigational chemotherapy treatment and *523 the resulting endoscopic remission of the cancer, Dr. Freireich stated that he would have been unable to predict as of March 1986 whether Gordon's cancer would recur. [10] Dr. Freireich also concluded that Gordon did not exhibit any clinical signs of imminent death on March 5, 1986. Although Dr. Freireich admitted that Gordon's condition could be compared to that of some of his other patients, he declined to offer an opinion as to Gordon's actual life expectancy as of March 5, 1986. Dr. Freireich's report states in pertinent part: His first therapy was given on October 5, 1985. By the time he received his second course of treatment, his swallowing had improved and the x-ray revealed partial response. Prior to his third treatment, we were *524 impressed that there was complete disappearance of his disease both on x-ray and by endoscopic examination of the esophagus. At that point we were extremely optimistic that a substantial, potentially long-lasting response would be achieved in his instance with this innovative treatment. His fourth admission here was on January 9, 1986, following the gunshot wound to his head. At that point he had still no evidence of recurrence of his disease and I personally found that his attitude was even more optimistic than it was before the accident. Therefore, we administered his fourth course of treatment in January, a fifth course in February and a sixth course in March. It was clear to me that he accepted the additional treatment designed to intensify the response we already observed, in hopes that his disease free period would be prolonged for a substantial period of time. In February, 1986, he wrote me a letter and asked me to state formally what his future would be and it was on February 19, 1986, that I wrote him a rather explicit letter telling him as matter-of-factly as I could what his prospects for survival were. I would direct your attention to this letter for additional *525 information regarding my opinion as to Mr. McLendon's prospects for survival. [11]
It is Dr. Freireich's philosophy that a physician should not give a patient a hopeless prognosis, and to the extent he can, he should give him an optimistic prognosis. Dr. Freireich did not review Gordon's records prior to the trial of this matter and as a consequence was not fully prepared to testify. For instance, Dr. Freireich initially testified that he was unaware that Gordon suffered from paralysis of the left vocal cord. Later in his testimony, Dr. Freireich stated (contrary to the known facts) that Gordon's vocal cord paralysis was attributable to Gordon's "accident" and was not related to his cancer. B. Dr. Fleischman
Dr. Roger A. Fleischman (Dr. Fleischman) prepared an expert report evaluating Gordon's physical condition as of March 5, 1986, and testified on respondent's behalf at trial. Dr. Fleischman received both a Ph.D. and an M.D. *526 degree from Harvard Medical School in 1975 and 1976, respectively, and has trained in the specialties of internal medicine, hematology, and oncology. Since 1983, Dr. Fleischman has served as an assistant professor of internal medicine at the University of Texas Southwestern Medical Center in Dallas, Texas. As a preliminary matter, Dr. Fleischman disagrees with the statement in Dr. Freireich's letter to Gordon dated February 19, 1986, characterizing the possibility that Gordon's cancer was permanently eradicated as "definite and significant". In Dr. Fleischman's view, this statement conflicts with Dr. Freireich's opinion of a 2 to 3 percent cure rate for patients with Gordon's history. Further, Dr. Fleischman believes that the statement was intended to provide a psychological benefit to Gordon by providing him with a hopeful outlook, but that such a statement was not realistic given Gordon's condition. Dr. Fleischman views the chemotherapy treatment that Gordon received as being largely palliative in the sense that the cancer would inevitably recur and cause Gordon's death. Consistent with Dr. Freireich's views, Dr. Fleischman opined that one could predict, with a greater than *527 95 percent likelihood, that Gordon would not be cured of his cancer. Dr. Fleischman agreed with Dr. Freireich that Gordon did not exhibit any clinical signs of imminent death on March 5, 1986. Dr. Fleischman's report states in pertinent part: Thus, at the time of March 5, 1986, Mr. McLendon was in a remission, as judged by the last endoscopy done at the end of November [1985] and the absence of dysphagia, or difficulty swallowing. However, without question, small amounts of the cancer were still present in the esophagus at this time, and recurrence of symptoms and death were inevitable and predictable. Essentially no one with this type and extent of esophageal cancer, and a prior failure with radiation treatment, is curable with chemotherapy alone. The treatment is intended to be palliative, and extend life in those who respond well for a total of 6-12 months, with only rare cases living longer than this. Thus, (1) I would first conclude that as of March 5, 1986, the decedent's condition was clearly terminal. Although he appeared to be in remission at this time, remissions in this disease average 5-8 months from the start of chemotherapy, and seldom last more *528 than a year. As of March 5, the remission was already 6 months long, and no other beneficial therapy existed for this disease. Thus, I would have considered the decedent to be in the final stages of a fatal disease, i.e. terminal. (2) Although in my opinion the decedent would be considered terminal as of March 5, 1986, his death could not be considered impending within weeks or a few months. Clearly, a remission in this disease can occasionally last longer than the average, and up to 15% of cases similar to the decedent's might still be alive at one year, and up to 5% at two years after achieving the remission. (3) Given these figures, on March 5, 1986, when Mr. McLendon had already been in remission for six months, I would estimate the likelihood of his death within one year to be greater than 90%. On the other hand, the decedent's death was not clearly impending within a year's time with absolute certainty, as a small number of cases, again less than 10% of similar cases, might still survive beyond a year. (4) However, the decedent's death was predictable to the extent that I have already indicated. By this I mean that the patient could be told with a fair degree of accuracy *529 that having achieved a remission with chemotherapy, on March 5, 1986, now 6 months into this remission, the life expectancy would be less than a year with a 90% likelihood. On the other hand, there was a small chance, that I estimate at about 1 in 10 that the patient would still be alive in one year's time, albeit almost certainly with recurrent tumor and worsening symptoms that would progress to death in the subsequent months thereafter. Fewer than 1 in 20 patients would still be alive at two years, and those still alive would almost all be facing an impending death by that time.
OPINION The issues to be resolved in this case relate to the proper transfer tax treatment of the private annuity transaction executed on March 5, 1986. Petitioner's liability for Federal gift tax turns primarily on the question of the fair market value of the remainder interest that Gordon transferred to Bart and the McLendon Family Trust and whether the transaction was based on an exchange of adequate and full consideration. In the event that we rule that the private annuity agreement resulted in a taxable gift, we are asked to decide whether a so-called saving clause included in the private annuity *530 agreement will be respected. Petitioner's liability for Federal estate tax turns on the applicability of section 2036(a). Specifically, we are asked to decide whether Gordon's retention of a life estate in the assets that were the subject of the private annuity agreement results in the inclusion of the value of those assets in his gross estate under section 2036(a). If we resolve this issue in the affirmative, we are asked to determine the amount of the offset or credit that petitioner is entitled to under section 2043(a). I. Gift Tax
Section 2501(a) provides the general rule that Federal gift tax will be imposed upon the value of property transferred by gift during each calendar year. Section 2511 in turn provides that the tax imposed by section 2501 generally shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible. The value of a gift in property is determined as of the date of the gift. Sec. 2512(a). The fair market value of property that is the subject of a gift generally is defined as "the price at which such property would change hands between a willing *531 buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts." Sec. 25.2512-1, Gift Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973). Further, the term "property" encompasses gifts of future interests such as a remainder interest. Smith v. Shaughnessy, 318 U.S. 176, 180-181 (1943). A gift may result from a transaction where property is transferred for less than adequate consideration. Sec. 2512(b); Harwood v. Commissioner, 82 T.C. 239, 257-258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986). Section 2512(b) provides: (b) Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.
Consistent with the foregoing, section 25.2512-8, Gift Tax Regs., provides in pertinent part: Transfers reached by *532 the gift tax are not confined to those only which, being without a valuable consideration, accord with the common law concept of gifts, but embrace as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor. However, a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth. * * *
See Estate of Friedman v. Commissioner, 40 T.C. 714, 719 (1963); S. Rept. 665, 72d Cong., 1st Sess. 39-41 (1932), 1939-1 C.B. (Part 2) 496, 524-526. As indicated, the primary issue concerning petitioner's liability for Federal gift tax relates to the value of the remainder interest that Gordon transferred to Bart and the McLendon Family Trust pursuant to the private annuity agreement. First, however, we are asked to determine the fair market value of Gordon's general *533 partnership interests in Tri-State and McLendon Co. as of March 5, 1986 (the date the private annuity agreement was executed). Once the question of the fair market value of the partnership interests is resolved, we are asked to decide whether it was appropriate for Gordon to compute the value of a remainder interest in the assets that were made the subject of the private annuity agreement under the actuarial tables set forth in section 25.2512-5(f) (Table A), Gift Tax Regs. A. Fair Market Value of the Partnership Interests
The parties have stipulated alternative values for Gordon's two partnership interests as follows: Tri-State
3/5/86
9/14/86 Expulsion scenario
$ 3,600,000 $ 3,600,000 Default scenario (rights exercised)
5,900,000
5,900,000
Default scenario (rights not exercised)
13,400,000
12,800,000
Assignee scenario
3,600,000
3,600,000
Liquidation scenario
37,800,000
36,200,000
McLendon Company
3/5/86
9/14/86 Expulsion scenario
$ 3,900,000
$ 3,800,000
Purchase rights exercised scenario
5,600,000
5,500,000
Purchase rights not exercised scenario
9,100,000
9,100,000
Sale to a third party scenario
5,100,000
5,100,000
Assignee scenario
3,900,000
3,800,000
*534 As is often the case, the parties have taken extreme positions respecting the question of fair market value. Respondent contends that the amendments to the partnership agreements, adopted in May and August 1985, after Gordon was diagnosed with esophageal cancer, should be disregarded in determining the value of Gordon's partnership interests as of March 5, 1986. Respondent asserts that the amendments lack a bona fide business purpose and were adopted for the primary purpose of allowing Gordon to transfer his property to his children for less than an adequate and full consideration. In the event that we sustain respondent's position on this point, respondent asserts that the fair market value of Gordon's partnership interest in Tri-State should be its liquidated value pursuant to paragraph 10.01(c) of the original Tri-State limited partnership agreement. [12]
*535 Relying on the testimony of Pallas, petitioner argues that the partnership amendments were intended to serve the valid business purpose of ensuring the continuity of the partnerships while at the same time leaving exclusive management and control with Bart. Petitioner further asserts that there in no support in the record for the notion that the amendments were intended to serve as a testamentary device. Assuming that the partnership amendments are respected, petitioner takes the position that it is appropriate to value the interests in question as "assignee" interests. [13] Petitioner's valuation theory is premised in part on the proposition that the Tri-State and McLendon Co. partnership agreements did not proscribe or inhibit Gordon's transfer of a remainder interest in his partnership interests. *536 We are not inclined to adopt either party's valuation theory. Simply stated, there is some evidence supporting petitioner's contention that the partnership amendments were adopted for the valid business purpose of assuring continued family management and control. See Estate of Bischoff v. Commissioner, 69 T.C. 32, 39-40 (1977); Estate of Littick v. Commissioner, 31 T.C. 181, 187 (1958). At the same time, however, we find merit in respondent's contention that the amendments were part of a comprehensive testamentary plan culminating with the private annuity agreement. In this regard, we note that: (1) The amendments (which opened the way for Gordon to enter into the private annuity agreement) were adopted shortly after Gordon's cancer was diagnosed; (2) the amendments were adopted in an informal and hasty fashion as reflected by the fact that Bart was unaware of the initial amendment of the Tri-State agreement; (3) each of the disputed transactions involved Gordon's immediate family; and (4) the dispositive provisions under Gordon's will and the private annuity agreement were nearly identical. It is well established *537 that transactions within a family group generally are subject to special scrutiny. Harwood v. Commissioner, 82 T.C. 239, 258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Kelley v. Commissioner, 63 T.C. 321, 325 (1974); Estate of Reynolds v. Commissioner, 55 T.C. 172, 201 (1970); Estate of Tiffany v. Commissioner, 47 T.C. 491, 499 (1967). Viewing the record as a whole, we are persuaded that the amendments were adopted in part for the purpose of achieving legitimate business objectives. Nonetheless, we cannot agree with respondent that we should disregard the amendments for purposes of determining the value of Gordon's partnership interests. We decline to adopt such an approach given that the partnerships were never in fact liquidated, and we believe the amendments served to limit the partners' ability to liquidate the partnerships. Nor are we inclined to value the partnership interests on the assumption that Gordon was simply transferring "assignee" interests. Under the circumstances, we view *538 the private annuity agreement as a device intended to permit Gordon to transfer his partnership interests to the natural objects of his bounty for less than adequate and full consideration. Initially, we note that there is no evidence that the private annuity agreement was negotiated at arm's length or that the parties attempted to bargain over the terms of the agreement. See sec. 25.2512-8, Gift Tax Regs. In fact, the amount that Gordon was to receive under the agreement was never firmly fixed. [14]
Equally important, and indicative of Gordon's disregard of the partnership agreements, we agree with respondent that Gordon's transfer of a remainder interest in his Tri-State partnership interest constituted a default under the Tri-State agreement. Without question, a sale by a partner of a remainder interest in his partnership interest constitutes a prohibited sale of "all or any part of his interest" in the partnership as plainly set forth in paragraph 9.04(c) of the Tri-State partnership *539 agreement. The effect of Gordon's transfer of a remainder interest in his McLendon Co. partnership interest is less clear. The language used in section 6 of the McLendon Co. partnership agreement is not as exacting as that used in the Tri-State agreement. Nevertheless, we conclude that the transfer in question was proscribed under the McLendon Co. agreement. We note that section 6 of the McLendon Co. agreement states in unambiguous terms that a partner may not assign his interest in the partnership or enter into any agreement as a result of which any person shall become interested with him in the partnership without the consent of the remaining partners. It is reasonable to construe this provision, standing alone, as prohibiting a partner from transferring a remainder interest in his partnership interest unless he first obtains the consent of the other partners. In any event, our interpretation of section 6 harmonizes with, and gives effect to, section 10 of the agreement which states that the surviving partners will have the option of purchasing a deceased partner's interest. [15] Reading sections 6 and 10 together, it seems inescapable that section 6 must be interpreted to *540 preclude a partner from transferring a remainder interest in his partnership interest. To read section 6 otherwise would render the surviving partners' option under section 10 largely meaningless. We also find it significant that Bart, a general partner in both Tri-State and McLendon Co., effectively controlled the partnerships and served as attorney in fact for Gordon, as trustee of the McLendon Family Trust, and as a legal representative for his grandparents' estates. In light of the intrafamily nature of the transaction and Bart's position *541 of ultimate control, we conclude that as a practical matter the interests transferred by Gordon to Bart (individually and as trustee) were the equivalent of partnership interests. In sum, to hold that Gordon merely transferred "assignee" interests would be to exalt form over substance. See, e.g., Estate of Maxwell v. Commissioner, 98 T.C. 594, 601 (1992), affd.    F.2d     (2d Cir., Aug. 23, 1993). This leaves us with the problem of attempting to determine a value for the two partnership interests within the confines of the parties' stipulation. Neither fits neatly within the stipulated values that we have been given. Consistent with the foregoing discussion, we hold that the transfers effected pursuant to the private annuity agreement should be treated as a transfer of Gordon's two partnership interests with the apparent consent of the remaining partners. In this regard, it is appropriate to value the Tri-State interest based on the "default scenario (rights not exercised)" under which a defaulting partner is entitled to sell his interest at fair market value if the remaining partners do not exercise their rights under article 9.04 of *542 the partnership agreement as amended May 30, 1985, to purchase the interest at book value. The parties agree that under this scenario the fair market value of Gordon's interest in Tri-State on March 5, 1986, is $ 13,400,000. Similarly, we conclude that it is appropriate to value the McLendon Co. interest based on the "sale to a third party" scenario under which a partner may sell his interest in the partnership with the consent of the remaining partners pursuant to section 6 of the original McLendon Co. partnership agreement. The parties agree that under this scenario the fair market value of Gordon's interest in McLendon Co. on March 5, 1986, is $ 5,100,000. B. Fair Market Value of Remainder Interest
Consistent with the preceding discussion, the aggregate fair market value of the assets that were the subject of the private annuity agreement was $ 23,162,970 on March 5, 1986. [16] With this figure in mind, we next turn to the question of the fair market value of a remainder interest in those assets as of the same date. More specifically, we are concerned with whether Gordon properly applied the actuarial tables set forth in section 25.2512-5(f) (Table A), Gift Tax Regs., *543 in computing the value of the remainder interest and the amount of his annuity under the private annuity agreement. Section 25.2512-5, Gift Tax Regs., contains actuarial tables to assist in the computation of the fair market value of annuities, life estates, terms for years, remainders, and reversions transferred after November 30, 1983, and before May 1, 1989. See Notice 89-60, 1989-1 C.B. 700, for transfers after April 30, 1989. Section 25.2512-5(a)(2), Gift Tax Regs., *544 provides in pertinent part: (2) The present value of an annuity, life estate, remainder, or reversion determined under this section which is dependent on the continuation or termination of the life of one person is computed by the use of Table A in paragraph (f) of this section. * * *
The actuarial tables referred to above are provided as an administrative necessity and their general use has been approved by the courts. Simpson v. United States, 252 U.S. 547, 550-551 (1920); Estate of Fabric v. Commissioner, 83 T.C. 932, 941 (1984). The actuarial tables regularly are applied in valuing contingent property interests given that they "afford a reasonable norm and some degree of certainty in ascertaining the value of property and the consequent tax liabilities of beneficiaries thereof." Miami Beach First Natl. Bank v. United States, 443 F.2d 116, 119 (5th Cir. 1971). Nonetheless, the courts have long recognized that the actuarial tables should not be applied in those "exceptional cases" where the result would be unreasonable. Id. at 120; Estate of Lion v. Commissioner, 438 F.2d 56, 61 (4th Cir. 1971), *545 affg. 52 T.C. 601 (1969); Weller v. Commissioner, 38 T.C. 790, 803 (1962). The party seeking to eschew the actuarial tables bears the burden of proving that the circumstances justify a departure from the norm. Bank of California v. United States, 672 F.2d 758, 759-760 (9th Cir. 1982); Continental Ill. Natl. Bank & Trust Co. v. United States, 504 F.2d 586, 594 (7th Cir. 1974); Weller v. Commissioner, supra.
Petitioner and respondent disagree whether the actuarial tables were properly applied in computing the value of the remainder interest transferred pursuant to the private annuity agreement. The crux of the dispute centers on whether Gordon's death was sufficiently certain as of March 5, 1986, to justify a deviation from the actuarial tables. At a more fundamental level, the parties disagree with respect to the specific legal standard to apply in resolving this issue. Respondent contends that, as of the valuation date, the known medical facts concerning Gordon's esophageal cancer were sufficiently exceptional as to justify a *546 departure from the actuarial tables in valuing the remainder interest and the related annuity. Relying on Miami Beach First Natl. Bank v. United States, supra, and Estate of Fabric v. Commissioner, supra, respondent maintains that the proper inquiry is whether Gordon's death was either "imminent or predictable" as of March 5, 1986. Based on all the circumstances surrounding Gordon's illness, as well as the opinion of her medical expert (Dr. Fleischman), respondent contends that the likelihood of Gordon's death within 1 year was sufficiently predictable to overcome the presumptive correctness of the actuarial tables. Thus, respondent would have us value the remainder interest and the annuity relating thereto based on the substantially diminished life expectancy attributable to one with persistent esophageal cancer. Petitioner counters that Gordon's death was not predictable with any degree of medical certainty on March 5, 1986. On this basis, petitioner contends that Gordon had no choice but to utilize the actuarial tables in carrying out the necessary computations under the private annuity agreement. Petitioner relies *547 on Rev. Rul. 80-80, 1980-1 C.B. 194, for the proposition that death must be "clearly imminent" before a taxpayer will be justified in departing from the actuarial tables. Rev. Rul. 80-80, 1980-1 C.B. at 195, states in pertinent part: In view of recent case law, the resulting principle is as follows: the current actuarial tables in the regulations shall be applied if valuation of an individual's life interest is required for purposes of the federal estate or gift taxes unless the individual is known to have been afflicted, at the time of transfer, with an incurable physical condition that is in such an advanced stage that death is clearly imminent. Death is not clearly imminent if there is a reasonable possibility of survival for more than a brief period. For example, death is not clearly imminent if the individual may survive for a year or more and if such a possibility is not so remote as to be negligible. If the evidence indicates that the decedent will survive for less than a year, no inference should be drawn that death will be regarded as clearly imminent, because this question depends *548 on all the facts and circumstances.
Relying on the testimony of both of the medical experts, petitioner argues that Gordon's death was not clearly imminent on March 5, 1986, because Gordon was not showing clinical signs of imminent death on that date. To resolve the question of the applicability of the actuarial tables, it will be helpful to briefly review the cases and rulings in this area. [17] We begin with Estate of Jennings v. Commissioner, 10 T.C. 323 (1948), a case involving the proper value of a charitable bequest in the form of a remainder interest. In Estate of Jennings, the taxpayer left her surviving spouse a life estate in certain of her property with the remainder interest in the property bequeathed to charity. The Commissioner argued that the value of the remainder interest should be determined under the actuarial tables, while the taxpayer maintained that the determination should turn on the surviving spouse's actual life expectancy. The medical testimony showed that the surviving spouse's reasonable life expectancy was not more than 1 year from the date of the taxpayer's death. *549 We agreed with the taxpayer that the surviving spouse's actual physical condition was controlling with respect to the valuation and that his actual life expectancy was not more than 1 year. We observed: The United States Supreme Court has said that in making a deduction for a remainder interest bequeathed to charity, such as is here under consideration, "the value thereof must be determined from data available at the time of the death of decedent." United States v. Provident Trust Co., 291 U.S. 272. We held in the Estate of John Halliday Denbigh, 7 T.C. 387, that the use of established mortality tables, which are evidentiary only, must give way to the proven facts which show a less life expectancy. There, the life beneficiary was suffering from cancer in an "inoperable, incurable" form and was doomed to die within a year or two, whereas, according to the mortality table, she had a life expectancy of about sixteen years. Those are much like the facts in the instant case, and we think the same principle governs. * * * [Id. at 327-328.]
We followed the Estate of Jennings approach in a number of cases where *550 the actual life expectancy of the individual in question was shown to be 1 year or less. See Estate of Hoelzel v. Commissioner, 28 T.C. 384, 389 (1957) (life expectancy not in excess of 1 year); Estate of Butler v. Commissioner, 18 T.C. 914, 919-920 (1952) (life expectancy less than 1 year); Huntington Natl. Bank v. Commissioner, 13 T.C. 760, 765 (1949) (life expectancy not greater than 1 year); see also Estate of Denbigh v. Commissioner, 7 T.C. 387, 389 (1946) (life expectancy of a year or 2); Estate of Douglas v. Commissioner, a Memorandum Opinion of this Court dated March 31, 1953 (life expectancy between 6 months and a year); Estate of Hendrick v. Commissioner, a Memorandum Opinion of this Court dated July 7, 1950 (life expectancy not greater than 1 year). But cf. Estate of Jones v. Commissioner, T.C. Memo. 1977-87 (actuarial tables applied where chances of normal life span are substantial); Stillman v. Commissioner, T.C. Memo. 1965-94 (actuarial tables applied where life tenant's cancer *551 was not considered an acute condition on the valuation date). The Estate of Jennings case and its progeny were factually distinguished by the U.S. Court of Appeals for the Seventh Circuit in Continental Ill. Natl. Bank & Trust Co. v. United States, 504 F.2d 586 (7th Cir. 1974). In Continental Ill., the Government took the position that the taxpayer's actual life expectancy should be used in determining the value of a life estate in certain property, citing Rev. Rul. 66-307, 1966-2 C.B. 429, for the proposition that a departure from the actuarial tables is warranted where it is known that the taxpayer is afflicted with an incurable disease of advanced state and that the taxpayer could not survive for more than a brief period of time. [18]
As a preliminary *552 matter, the court resolved that the revenue ruling cited by the Government was intended to apply where it is known that the taxpayer is suffering from a fatal, incurable disease, and the taxpayer's actual life expectancy is brief (in absolute terms) or death is imminent. Id. at 590-591. Applying this standard to the facts presented, the court distinguished the revenue ruling and held that the taxpayer had properly applied the actuarial tables. In so holding, the court indicated that it was not prepared to overrule the trial judge's finding that it was possible that the taxpayer could have lived for another year or more. From the appellate court's perspective, this particular finding reflected the lower court's assessment of the credibility of the medical experts who presented conflicting testimony regarding the taxpayer's actual life expectancy. Id. at 592. The court also rejected the Government's reliance on the Estate of Jennings line of cases, stating: Departures from the tables are permitted, if at all, only where the result of using the tables is "unrealistic and unreasonable," Estate of Carl E. Weller, [* * * 38 T.C. 790, 803 (1962)]; *553 Estate of Chauncey Stillman, 24 T.C.M. 478, 497 (1965), or "ignores . . . common sense." Hall v. United States, 353 F.2d 500, 505 (7th Cir. 1965). [Id. at 594.]
Citing Stillman v. Commissioner, supra, the court concluded that, in light of the medical experts' testimony that the range of longevity for those afflicted with the taxpayer's condition could extend up to 6 years, any determination of the taxpayer's actual life expectancy would have been "little better than a guess." Continental Ill. Natl. Bank & Trust Co. v. United States, supra at 594. [19]
*554 The issue we confront today has also been addressed by the U.S. Court of Appeals for the Fifth Circuit (the circuit to which an appeal would lie in this case) in Miami Beach First Natl. Bank v. United States, 443 F.2d 116 (5th Cir. 1971). In Miami Beach, like Estate of Jennings, the taxpayer bequeathed his residuary estate to his surviving spouse for life with the remainder left to charity. On appeal, the Government argued that the trial court erred in valuing the charitable remainder interest on the basis of medical testimony regarding the probable life expectancy of the surviving spouse rather than on the basis of the actuarial tables. As was the case in Continental Ill., the medical experts presented conflicting views as to the surviving spouse's probable life expectancy. While one treating physician estimated that the surviving spouse would live 4 to 5 years, another held the view that it was not possible to render an accurate medical opinion respecting life expectancy. Despite the latter opinion, the District Court found the surviving spouse's life expectancy to be 5 years. Miami Beach First Natl. Bank v. United States, supra at 118. *555 In analyzing the issue on appeal, the Fifth Circuit recognized as a preliminary matter that the presumptive correctness of the actuarial tables may be overcome where there is sufficient evidence regarding the actual life expectancy of the individual in question. Citing Estate of Jennings as an example, the court stated: It is only where the established facts are sufficient to justify a departure from the Regulations that exceptions are allowed. Such exceptions have been recognized, for instance, where the death of a life tenant is imminent or predictable. * * * [Id. at 120.]
Applying these principles to the facts before it, the Fifth Circuit reversed the District Court on the ground that the taxpayer did not present sufficient evidence to overcome the presumptive correctness of the actuarial tables. Id. at 120. In the court's view, the surviving spouse's death was neither predictable nor imminent, and the medical testimony to the contrary was characterized as highly speculative. Id.[20]
*556 We conclude our survey of the cases with a brief mention of Estate of Fabric v. Commissioner, 83 T.C. 932 (1984), a case involving a factual pattern somewhat analogous to that in the instant case. In Estate of Fabric, the taxpayer transferred assets to a foreign trust and entered into an annuity agreement with the trustee of the trust just 5 days before she was scheduled for open-heart surgery. The Commissioner took the position that the annuity should have been valued based upon the taxpayer's physical condition and actual life expectancy, as opposed to using the actuarial tables. In rejecting respondent's position, we distinguished the Estate of Jennings line of cases on the ground that it was not established that the taxpayer's maximum life expectancy was 1 year or less. To the contrary, we emphasized that the uncontroverted testimony of the taxpayer's physician was that the taxpayer could have lived up to 5 years from the valuation date. Id. at 942. We concluded our opinion by stating: The evidence demonstrates that the decedent's death was not clearly imminent or predictable at the time she entered *557 into the annuity agreement. Only where death is imminent or predictable will departure from the tables be justified. See Miami Beach First National Bank v. United States, supra at 120. * * * [Id. at 943.]
The common theme of these cases is that the actuarial tables generally are to be respected unless the established facts show that the result under the tables is unrealistic or unreasonable. Consistent with the Estate of Jennings line of cases, the proper inquiry in this case is whether the life tenant's actual life expectancy is so exceptional that a departure from the actuarial tables is justified. While the term "exceptional" is difficult to define, Estate of Jennings and its progeny require proof that death is either imminent or predictable to a reasonable certainty within 1 year of the valuation date. With the foregoing as background, we look to the expert reports and the question of whether Gordon's actual life expectancy was so limited as to justify a departure from the actuarial tables in computing the value of the remainder interest in question. The opinion of an expert is admissible if it will assist the trier of *558 fact in resolving a fact in issue. See Fed. R. Evid. 702. But even where opinion evidence is relevant and admissible, it must be given its appropriate weight as is proper in light of the expert's qualifications and in regard to all other evidence presented. Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. T.C. Memo. 1956-178. It is our prerogative to accept or reject expert testimony if, in our best judgment, such action is proper. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285. The medical experts could not agree with respect to Gordon's actual life expectancy on March 5, 1986. Petitioner's expert, Dr. Freireich, impressed the Court with his credentials and expertise in oncology. However, he had not reviewed Gordon's medical records prior to trial and therefore was not fully prepared to testify. Dr. Freireich's lack of preparation was evident from his inconsistent testimony regarding the presence and significance *559 of Gordon's left vocal cord paralysis. Although he admitted that the cure rate for patients with Gordon's condition would be limited to 2 to 3 percent, Dr. Freireich declined to offer an opinion respecting either Gordon's actual life expectancy or the likelihood that the cancer would recur. We cannot agree that there was no basis for Dr. Freireich to form an opinion on either point. In particular, in his letter to Gordon dated February 19, 1986, Dr. Freireich stated that he administered the same investigational treatment to several patients at M.D. Anderson with diagnoses similar to Gordon's. Further, Dr. Freireich was privy to studies and information from other cancer centers around the country that were conducting closely related programs. When questioned about the matter at trial, Dr. Freireich admitted that Gordon's condition could be compared with these other cases. We find it interesting that while Dr. Freireich characterized the results achieved under the particular chemotherapy treatment regimen as "most promising", petitioner made no effort to make the pertinent results part of the record in this case. In contrast to Dr. Freireich, respondent's expert, Dr. Fleischman, *560 opined that Gordon's actual life expectancy probably would not extend beyond 6 months from March 1986, with death a virtual certainty within a year of that date. We note that Gordon followed the expected pattern and succumbed to the disease within 6 months of the valuation date. Dr. Fleischman based his opinion on a review of the history of Gordon's illness and past experience relating to the average remission in esophageal cancer cases. Considering the record as a whole, we are compelled to agree with Dr. Fleischman that Gordon's actual life expectancy on March 5, 1986, was quite limited. We begin with the fact that Gordon's cancer recurred after extensive radiation therapy over the summer of 1985. By the time he was referred to Dr. Freireich in October 1985, his cancer was classified as systemic based upon the suspicion that the cancer had spread outside of the affected area. Further, the consensus among the treating physicians was that surgery was not an option for Gordon due to damage to the affected area resulting from the radiation therapy. The chances for a cure in Gordon's case were at best about 2 or 3 percent. Although Gordon achieved an endoscopic complete remission *561 in November 1985, that fact alone does not convince us that Gordon's death was not imminent or predictable. First, there is no dispute that a remission based on an endoscopic examination is not the best standard for determining whether a cancer has been completely eradicated. Surgery generally is required to definitively establish that a cancer is completely eradicated. Unfortunately, surgery was not a viable option in Gordon's case. We are also persuaded by Dr. Fleischman's testimony that remissions in esophageal cancer are generally short lived. In addition, and perhaps more importantly, it strikes the Court as particularly suspect that no endoscopies were performed on Gordon between late November 1985 and May 1986, when the cancer was again detected. Both experts agree that, given the luxury of hindsight, it was obvious that Gordon's cancer was present as of March 5, 1986. Further, Gordon's chemotherapy treatments were interrupted in December 1985, when Gordon attempted suicide. The suicide note left by Gordon indicates that he had relinquished any hope of surviving the cancer. Although Gordon failed in his suicide attempt, his physical condition was quite serious and *562 he continued to suffer from significant medical complications well after being released from the hospital. Gordon's mental state continued to be of concern from the time he first entered M.D. Anderson throughout the treatment period. We give little weight to the correspondence between Gordon and Dr. Freireich in February 1986. While the initial letter from Gordon to Dr. Freireich (purportedly dictated by Gordon but not signed) gives the impression that Gordon was quite optimistic at the time, petitioner failed to establish that Gordon in fact dictated the letter. The letter was typed by "bpo" whom we surmise was Billie Odom, Gordon's secretary. Petitioner had ample opportunity to call Billie Odom as a witness to testify on the point but failed to do so. Under the circumstances, we assume that her testimony would have been damaging to petitioner's case. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We likewise give little weight to Dr. Freireich's return letter dated February 19, 1986, on the ground that it appears to be colored by Dr. Freireich's philosophy *563 that a physician should never give a patient an unfavorable or pessimistic prognosis. In sum, the record as a whole paints a picture of an increasingly sick man suffering from a virtually incurable disease. Although Gordon's physical condition fluctuated from day to day, the overall trend was one of fairly rapid deterioration. Under the circumstances, we conclude that it was evident to all involved that Gordon was not likely to survive more than 1 year from March 5, 1986. [21] In light of Gordon's diminished actual life expectancy on the date that the private annuity agreement was executed, we hold that it was improper for Gordon to compute the value of the remainder interest in question under section 25.2512-5(f) (Table A), Gift Tax Regs. Rather, the remainder interest is properly valued based on Gordon's actual life expectancy as of March 5, 1986, which we hold to be 1 year. *564 To briefly recapitulate, the parties to the private annuity agreement understated the full fair market value of the assets (including the two partnership interests) that were the subject of that agreement. As of March 5, 1986, the aggregate fair market value of the several assets in question was $ 23,162,970, compared with the $ 18,362,970 figure used by the parties to the agreement. Further, the value of a remainder interest in those assets was understated as a consequence of Gordon's use of the annuity tables in carrying out that computation. It necessarily follows that Gordon did not receive adequate and full consideration in exchange for the property interest that he transferred pursuant to the private annuity agreement. Given the relationship of the parties to the private annuity agreement, a presumption arises that the difference in the consideration received by Gordon and the value of the property that he transferred represents a taxable gift. See Harwood v. Commissioner, 82 T.C. 239 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); see also Estate of Bergan v. Commissioner, 1 T.C. 543, 553-554 (1943) *565 (value of gift equals value of property transferred over value of annuity promised). Petitioner has not overcome this presumption. As previously discussed, the overwhelming sense of the Court is that Gordon entered into the annuity transaction solely for the purpose of achieving testamentary objectives. There is no evidence that the transaction was conducted at arm's length or that the parties attempted to bargain over the terms of the agreement. See sec. 25.2512-8, Gift Tax Regs. Moreover, the amount that Gordon was to receive under the agreement was never firmly fixed. [22] The lack of an arm's-length bargain is further evidenced by the fact that (other than the $ 250,000 paid to Gordon at the time the annuity agreement was executed) the consideration promised Gordon, an annuity payable over his lifetime as computed under the annuity tables, was at best illusory given Gordon's diminished actual life expectancy. Suffice it to say that Gordon, an astute and sophisticated businessman, would not have entered into a similar arrangement with an unrelated third party. Cf. Kincaid v. United States, 682 F.2d 1220, 1225 (5th Cir. 1982). *566 Our conclusion that Gordon entered into the private annuity agreement primarily for the purpose of achieving testamentary objectives is also supported by Bart's July 3, 1986, letter to Spellings of MBank. Although the letter is subject to interpretation, we believe the letter reflects Bart's understanding that the private annuity agreement was structured as a substitute for a testamentary disposition of Gordon's assets. In sum, we reject petitioner's contention that the private annuity transaction was a bona fide arm's-length transaction free from donative intent. We hold that petitioner is liable for Federal gift tax to the extent that the value of the remainder interest transferred by Gordon exceeds the $ 250,000 amount that Gordon actually received at the time the private annuity agreement was executed. C. "Savings" Clause
The private annuity agreement includes a paragraph allowing for an adjustment to the amount to be paid to Gordon in the event that a higher value is assigned to the remainder interest through a settlement with the Internal Revenue Service or as a result of a final decision of this Court. The paragraph in question states: The parties hereto recognize *567 that the valuation of many of the assets set out on attached Exhibit A are, by their nature, as determined by the best judgement of the parties and independent consultants engaged to assist in the valuation process and may be subject to differing opinions. Therefore, the parties agree that, to the extent any of the values on the attached Exhibit A are changed through a settlement process with the Internal Revenue Service, or a final decision of the United States Tax Court, the purchase price hereunder shall be adjusted accordingly, with interest on said adjustment at the rate of ten percent (10%) from the date hereof until said final determination of value, and the annuity payments due and payable hereunder shall likewise be adjusted to reflect any such change in valuation.
The parties disagree whether this provision affects the Court's determination respecting petitioner's gift tax liability. Petitioner, relying on King v. United States, 545 F.2d 700 (10th Cir. 1976), asserts that we should respect the adjustment paragraph. In light of our determination that the private annuity agreement resulted in a gift, petitioner argues that the adjustment *568 provision will operate to require the obligors to pay additional amounts to Gordon's estate, thereby eliminating the gift but at the same time increasing the gross estate that is subject to Federal estate tax. Respondent counters that the Court should follow cases such as Commissioner v. Procter, 142 F.2d 824 (4th Cir. 1944), revg. on other grounds a Memorandum Opinion of this Court dated July 6, 1943, and Ward v. Commissioner, 87 T.C. 78 (1986), and hold that the adjustment provision has no effect under the circumstances presented. We agree with respondent. In Commissioner v. Procter, supra, the taxpayer transferred certain property interests to a trust for the benefit of his children. However, the trust instrument provided in pertinent part that, if a competent Federal court of last resort should find any part of the transfer to be subject to gift tax, then that portion of the property subject to such tax would not be considered to have been transferred to the trust. In refusing to respect this adjustment provision the court concluded: We do not think that the gift tax can be *569 avoided by any such device as this. Taxpayer has made a present gift of a future interest in property. He attempts to provide that, if a federal court of last resort shall hold the gift subject to gift tax, it shall be void as to such part of the property given as is subject to the tax. This is clearly a condition subsequent and void because contrary to public policy. A contrary holding would mean that upon a decision that the gift was subject to tax, the court making such decision must hold it not a gift and therefore not subject to tax. Such holding, however, being made in a tax suit to which the donees of the property are not parties, would not be binding upon them and they might later enforce the gift notwithstanding the decision of the Tax Court. It is manifest that a condition which involves this sort of trifling with the judicial process cannot be sustained. [Id. at 827.]
The court went on to point out that the adjustment clause should be viewed as contrary to public policy on the grounds that: (1) Public officials would be discouraged from attempting to collect the tax since the only effect would be to defeat the gift; (2) the adjustment *570 provision would tend to obstruct the administration of justice by requiring the court to address a moot case; and (3) the provisions should not be permitted to defeat a judgment rendered by the court. Id.
We followed Procter in Ward v. Commissioner, supra. In the latter case, the taxpayers, husband and wife, each transferred 25 shares of stock to each of their three sons. At the time of the gifts, the taxpayers and their sons executed a "gift adjustment agreement" that was intended to ensure that the taxpayers' gift tax liability for the stock transfers would not exceed the unified credit against gift tax that the taxpayers were entitled to at that time. Id. at 87-88. In particular, the agreement stated that if it should be finally determined for Federal gift tax purposes that the fair market value of the transferred stock either was less than or greater than $ 2,000 per share, an adjustment would be made to the number of shares conveyed so that each donor would have transferred $ 50,000 worth of stock to each donee. Id. We concluded that the fair market value of the stock exceeded $ 2,000 per share *571 for each of the years in issue. Id. at 109. In rejecting the taxpayers' position in Ward, we first noted that honoring the adjustment agreement would run counter to the policy concerns articulated in Procter. Id. at 113. In addition, we were not persuaded by the taxpayers' argument that the mere possibility of the application of the Federal estate tax to the excess gift was sufficient to distinguish Procter.[23] Finally, we concluded that upholding the adjustment agreement would result in unwarranted interference with the judicial process, stating: Furthermore, a condition that causes a part of a gift to lapse if it is determined for Federal gift tax purposes that the value of the gift exceeds a given amount, so as to avoid a gift tax deficiency, involves the same sort of "trifling with the judicial process" condemned in Procter. If valid, such condition would compel us to issue, in effect, a declaratory judgment as to the stock's value, while rendering the case moot as a consequence. Yet, there is no assurance that the petitioners will actually reclaim a portion of the stock previously conveyed *572 to their sons, and our decision on the question of valuation in a gift tax suit is not binding upon the sons, who are not parties to this action. The sons may yet enforce the gifts. [Id. at 114.]
Based upon our review of Procter and Ward, the adjustment clause at issue in the instant case does not merit consideration for purposes of determining petitioner's gift tax liability, and we so hold. In our view, it makes little sense to expend precious judicial resources to resolve the question of whether a gift resulted from the private annuity transaction *573 only to render that issue moot. Equally important, our determination that the private annuity agreement resulted in a taxable gift is not directly binding on Bart or the McLendon Family Trust who are not parties to this case. See Ward v. Commissioner, supra at 114. Consequently, there being no assurance that the terms of the adjustment clause will be respected, it shall have no impact on this case. Petitioner's reliance on King v. United States, 545 F.2d 700 (10th Cir. 1976) is misplaced. That case involved a sale of stock which the court found to be an arm's-length transaction, free from any donative intent. Like that in Ward v. Commissioner, 87 T.C. 78, 116 (1986), however, the transaction at issue in the instant case was not an arm's-length deal, and thus we distinguish the King case on this basis. Further, we have previously questioned the factual findings supporting the holding in King. See Harwood v. Commissioner, 82 T.C. 239, 271 n.23 (1984). D. Additions to Gift Tax
Respondent determined that petitioner is liable for an addition *574 to gift tax under section 6651(a)(1). Section 6651(a) provides for an addition to tax where the taxpayer fails to file a timely return unless the taxpayer shows that such failure is due to reasonable cause and is not due to willful neglect. Respondent further determined that petitioner is liable for additions to gift tax under section 6653(a)(1) and (2), which provides for additions to tax if an underpayment of tax required to be shown on a return is due to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner maintains that respondent erred in determining the above-described additions to gift tax on the ground that petitioner properly followed Rev. Rul. 80-80, 1980-1 C.B. 194, in its treatment of the private annuity transaction. We agree that petitioner's failure to file a gift tax return was due to reasonable cause. In particular, petitioner faced an uncertain and difficult question with respect to the applicability of the annuity tables. We are also *575 convinced that petitioner reasonably relied upon Gordon's attorney for an interpretation of Rev. Rul. 80-80, supra, as well as how to properly report the transaction. United States v. Boyle, 469 U.S. 241, 251 (1985); Otis v. Commissioner, 73 T.C. 671, 675 (1980), affd. without published opinion 665 F.2d 1053 (9th Cir. 1981). We further note that income was reported with respect to the transaction on Gordon's final Federal income tax return. Given these factors, we conclude that petitioner's failure to file a gift tax return was due to reasonable cause and was not due to willful neglect. For the same reasons, we likewise conclude that petitioner is not liable for the additions to tax for negligence under section 6653(a)(1) and (2). In short, petitioner made a reasonable effort to ensure that its Federal gift tax liability was properly reported. II. Federal Estate Tax
The Federal estate tax provides for a tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. Sec. 2001; U.S. Trust Co. v. Helvering, 307 U.S. 57, 60 (1939). *576 We discussed the history and development of the estate tax in detail in Estate of Sachs v. Commissioner, 88 T.C. 769, 774-777 (1987), affd. in part and revd. in part 856 F.2d 1158 (8th Cir. 1988). The taxable estate is defined in section 2051 as the gross estate less deductions. Pursuant to sections 2031 and 2033, the value of the gross estate includes the value of all property to the extent of the interest therein of the decedent at the time of his death. Further, under a network of statutory rules, the gross estate includes certain transfers effected during the lifetime of the decedent. See generally secs. 2035 through 2038. The transfer provision at issue in the case at hand is section 2036, entitled "TRANSFERS WITH RETAINED LIFE ESTATE", which provides in pertinent part: (a) General Rule. -- The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life *577 or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death -- (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.
In sum, section 2036(a) provides that, absent a bona fide sale for adequate and full consideration, the value of property transferred during life is nonetheless included in the transferor's gross estate if the transferor retained for life either the right to the possession, enjoyment, or income from the property, or the right to designate the persons who shall possess or enjoy the property. United States v. O'Malley, 383 U.S. 627, 631 (1966); Estate of Spruill v. Commissioner, 88 T.C. 1197, 1224-1225 (1987); Estate of Glen v. Commissioner, 45 T.C. 323, 330-331 (1966). Section 2043(a) provides relief from potential double taxation where property that is subject to section 2036(a) is transferred for insufficient consideration. *578 Estate of Frothingham v. Commissioner, 60 T.C. 211, 216 (1973). Section 2043(a) provides in pertinent part: (a) In General. -- If any one of the transfers, trusts, interests, rights, or powers enumerated and described in sections 2035 to 2038, inclusive, and section 2041 is made, created, exercised or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.
Thus, where a taxpayer transfers an interest in property for inadequate consideration under section 2036(a), the value of the property will be included in his gross estate with an offset under section 2043(a) to reflect the consideration received. Estate of Gregory v. Commissioner, 39 T.C. 1012, 1019 (1963). Respondent determined that Gordon's retention of a life estate in the assets that were the subject of the private *579 annuity agreement results in the inclusion of those assets in his gross estate pursuant to section 2036(a). Assuming that section 2036(a) applies, respondent further determined that petitioner is entitled to an offset under section 2043(a) in the amount of $ 250,000 for the consideration that Gordon received on the day the private annuity agreement was executed. Petitioner disagrees on both points. First, petitioner argues that section 2036(a) does not apply in this case by virtue of the parenthetical exception set forth therein for bona fide sales for adequate and full consideration. Petitioner maintains that Gordon received     adequate and full consideration for the remainder interest he transferred pursuant to the private annuity agreement, and therefore section 2036(a) does not apply. In the event we rule in respondent's favor on this point, petitioner argues that the offset under section 2043(a) should equal $ 6,581,784, which petitioner alleges is the present value of the annuity that Bart and the McLendon Family Trust agreed to pay to Gordon in consideration for the remainder interest in Gordon's assets. A. Section 2036(a)
The parties disagree with respect to the *580 proper interpretation of the parenthetical exception set forth in section 2036(a). Petitioner would test the consideration received by Gordon against the value of the remainder interest that he transferred. In contrast, respondent maintains that "decedent must have received full value for the entire property subject to the private annuity transaction, not merely full value for the remainder interest transferred" to avoid the application of section 2036(a). Respondent relies primarily on Gradow v. United States, 11 Cl. Ct. 808 (1987), affd. 897 F.2d 516 (Fed. Cir. 1990), in conjunction with United States v. Past, 347 F.2d 7 (9th Cir. 1965); United States v. Allen, 293 F.2d 916 (10th Cir. 1961); and Estate of Gregory v. Commissioner, supra, to support her position. Petitioner contends that the Gradow case was wrongly decided. [24]
*581 We need not address the parties' dispute over the proper interpretation of section 2036(a). In short, Gordon failed to receive an adequate and full consideration even if petitioner is correct that the consideration is measured against the value of the remainder interest in dispute. There is no question that Gordon retained a life estate in (and the economic benefit of) the assets that were the subject of the private annuity agreement. Clearly, such a retained life estate falls within the intended scope of section 2036(a). Commissioner v. Estate of Church, 335 U.S. 632, 644-645 (1949); Estate of De Foucaucourt v. Commissioner, 62 T.C. 485, 491 (1974), and cases cited therein; Estate of Gregory v. Commissioner, supra at 1018; Estate of Goetchius v. Commissioner, 17 T.C. 495, 501 (1951). Moreover, we have already determined that Gordon did not receive an "adequate and full consideration" as contemplated under section 2512(b) and section 25.2512-8, Gift Tax Regs., for the remainder interest that he transferred pursuant to the private annuity agreement. It *582 is well settled that Federal estate and gift taxes are in pari materia and must be construed together. Estate of Sanford v. Commissioner, 308 U.S. 39, 44 (1939); Estate of Jalkut v. Commissioner, 96 T.C. 675, 682 (1991). As we explained in Estate of Friedman v. Commissioner, 40 T.C. 714, 718-719 (1963): The phrase "an adequate and full consideration in money or money's worth" common to both the estate and gift tax statutes here pertinent, is to be given an "identical construction" in regard to each of them. Merrill v. Fahs, 324 U.S. 308 (1945); Harris v. Commissioner, 340 U.S. 106 (1950); Estate of John M. Goetchius, 17 T.C. 495 (1951). * * * [Fn. refs. omitted.]
Because we have resolved that Gordon did not receive an adequate and full consideration under the private annuity agreement for purposes of applying the Federal gift tax, it necessarily follows that the same consideration was inadequate for purposes of applying the Federal estate tax, and we so hold. In order to determine the *583 fair market value of Gordon's partnership interests on the date of his death, we return to the parties' stipulation. With respect to Tri-State, we conclude that fair market value is best reflected under the "default scenario (rights not exercised)" under which a defaulting partner is entitled to sell his interest at fair market value in the event the remaining partners do not exercise their option rights. Under this approach, the fair market value of Gordon's interest in Tri-State as of September 14, 1986, is $ 12,800,000. With respect to McLendon Co., we believe that fair market value is best reflected under the "sale to a third party" scenario under which a partner may sell his interest with the consent of the remaining partners. Under this approach, the fair market value of Gordon's interest in McLendon Co. as of September 14, 1986, is $ 5,100,000. To the extent that petitioner did not contest the values determined by respondent with respect to the remaining assets that were the subject of the private annuity agreement, those values are deemed conceded. The aggregate of these amounts is includable in Gordon's gross estate pursuant to section 2036(a). B. Section 2043(a)
*584 Having resolved the section 2036(a) issue, we turn to the proper application of section 2043(a). Petitioner maintains that if section 2036(a) applies, then the estate is entitled to an offset under section 2043(a) in the amount of the value of the annuity promised Gordon under the private annuity agreement. Respondent determined that petitioner is entitled to an offset for the $ 250,000 actually paid to Gordon on the date the private annuity agreement was executed. The parties have not cited any case law in support of their respective positions. [25]
Section 2043(a) was first enacted into law as section 302(i) of the Revenue Act of 1926, ch. 27, 44 Stat. 9. While we observed in Estate of Frothingham v. Commissioner, 60 T.C. 211, 216 (1973), that legislative history *585 on the provision is nonexistent, we nonetheless concluded that: It was plainly designed to deal with the situation where the decedent has received some, but not "adequate and full" consideration for the transfer. In providing that there shall be included in the gross estate "only the excess of the fair market value at the time of death of the property * * * over the value of the consideration received therefor by the decedent" (emphasis supplied), Congress was obviously attempting merely to provide a measure of relief from double taxation of the same economic interest. See Updike v. Commissioner, 88 F.2d 807, 813 (C.A. 8), certiorari denied 301 U.S. 708. * * * [Alteration in original.]
Consistent with the foregoing, we hold that section 2043(a) provides for an offset limited to the $ 250,000 amount actually transferred to Gordon pursuant to the private annuity agreement. We have already concluded that the annuity promised to Gordon in exchange for the remainder interest was wholly illusory. It would defy logic to allow petitioner an offset for such a meaningless promise. [26] Further, such an offset would run *586 contrary to the policy underlying section 2043(a) -- to provide a measure of relief from double taxation of the same economic interest. Because the promised annuity payments were not intended to make their way into Gordon's gross estate, there is no risk that petitioner will be subjected to double taxation on the value of the property in question. C. Additions to Estate Tax
Respondent determined that petitioner is liable for additions to its Federal estate tax under section 6653(a)(1) and (2), which provides for additions to tax if an underpayment of tax required to be shown on a return is due to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). *587 We have concluded that the fair market value of the assets that were made the subject of the private annuity agreement should have been included in the computation of the gross estate under section 2036(a). Nonetheless, we conclude that petitioner reasonably relied upon the advice of Gordon's attorney in filing its estate tax return. United States v. Boyle, 469 U.S. 241, 251 (1985); Otis v. Commissioner, 73 T.C. 671, 675 (1980), affd. without published opinion 665 F.2d 1053 (9th Cir. 1981). In this regard, we hold that petitioner exercised due care in filing its estate tax return, and thus respondent erred in determining that petitioner is liable for the additions to tax for negligence. Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect on the date of Gordon B. McLendon's death. Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 25 percent of the amount shown as tax on a return specified in sec. 6651(a)(1).↩
2. 50 percent of the interest due on $ 31,142,507.↩
2. The initials "bpo" appear to belong to Billie P. Odom, Gordon's personal secretary. Petitioner did not call Odom to testify at trial or otherwise explain her absence.↩
3. It appears from a review of the notice of deficiency in estate tax that Gordon valued the 3-percent interest in the McLendon Co. at $ 355,220 and reported the transaction in a Federal gift tax return filed for the 1985 taxable year.↩
4. Gordon executed several versions of his last will and testament, including three versions between June and August 1985.↩
5. The parties agree that petitioner will be entitled to a refund of the Federal income tax attributable to the private annuity transaction to the extent, if any, that respondent prevails in the instant case. However, the matter of Gordon's Federal income tax is not before us and is irrelevant to the disposition of this case.↩
6. Petitioner's Federal estate tax return was prepared by Anderson Wallace, Jr.↩
7. Respondent now concedes that the correct value of the 3-percent general partnership interest is $ 479,568.↩
8. Respondent determined that the fair market value of the partnership interest was $ 873,754, rather than $ 355,220 as listed on the gift tax return for the calendar year ending Dec. 31, 1985. Accordingly, respondent increased adjusted taxable gifts by $ 518,534.↩
9. While petitioner assigns error to this particular item in its petition, petitioner did not otherwise contest the point, and thus it is deemed conceded.↩
10. Dr. Freireich believes that if a remission is achieved using an investigational form of cancer treatment, the treating physician can only conclude that the cancer will not recur because generally the physician will have no experience to call upon to conclude otherwise.↩
11. The full text of the February 1986 letter is set forth supra↩ pp. 11-13.
12. While respondent makes a similar assertion with respect to McLendon Co., we note that the parties did not stipulate a liquidated value for McLendon Co. It appears to be respondent's position that the fair market value for McLendon Co. should be $ 9,100,000 under the purchase rights not exercised scenario.↩
13. Petitioner asserts that the interests that Gordon transferred are merely assignee interests based on Tex. Rev. Civ. Stat. Ann. art. 6132b, sec. 27(1) (1970), which provides in pertinent part: (1) A conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, nor, as against the other partners in the absence of an agreement, entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the partnership business or affairs; it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled and, for any proper purpose, to require reasonable information or account of partnership transactions and to make reasonable inspection of the partnership books.↩
14. See infra↩ note 22.
15. In Park Cities Corp. v. Byrd, 534 S.W.2d 668, 672 (Tex. 1976), the Supreme Court of Texas made it clear that partnership agreements are construed and interpreted in the same manner as contracts. In construing a contract, all the provisions thereof must be considered together in order to arrive at the true intent of the parties. Southland Royalty Co. v. Pan Am. Petroleum Corp., 378 S.W.2d 50, 53↩ (Tex. 1964).
16. The $ 23,162,970 figure is derived by adding the fair market value of the partnership interests as determined above to the values of the remaining assets that were made the subject of the private annuity agreement, as follows: ↩
Tri-State general partnership interest
$ 13,400,000
McLendon Co. general partnership interest
5,100,000
1,000 shares of Gordon McLendon, Inc.
200,000
20 acres of real property in Denton County, Texas
280,000
Gordon's interest in the McLendon Co.
Pension Trust
4,182,970
23,162,970
17. Before reviewing the case law in this area, we will address petitioner's assertion that respondent's position in this case is somehow inconsistent or in conflict with Rev. Rul. 80-80, 1980-1 C.B. 194↩. The revenue ruling states that the actuarial tables are controlling unless the individual is known to have been afflicted, at the time of the transfer, with an incurable physical condition that is in such an advanced stage that death is clearly imminent. Generally, the question of whether death is clearly imminent is to be determined on the facts and circumstances of the particular case. The revenue ruling sets forth a limited and somewhat vague safe harbor: the actuarial tables may be used in cases where the individual may survive for a year or more and if the possibility of survival is not so remote as to be negligible. In light of the evidence presented regarding Gordon's medical condition, we find that it was reasonable for respondent to reject Gordon's use of the actuarial tables.
18. Rev. Rul. 80-80, 1980-1 C.B. 194, was issued in part to clarify Rev. Rul. 66-307, 1966-2 C.B. 429↩.
19. In Stillman v. Commissioner, T.C. Memo. 1965-94, we declined to give much weight to the testimony of the one medical expert who attempted to estimate the actual life expectancy of the life tenant. In the absence of persuasive testimony on this point, we found Estate of Jennings v. Commissioner, 10 T.C. 323↩ (1948), and its progeny to be distinguishable.
20. The Court of Appeals for the Fifth Circuit recently cited Miami Beach First Natl. Bank v. United States, 443 F.2d 116 (5th Cir. 1971), for the proposition that "employing valuation procedures other than actuarial tables [such as consideration of evidence of actual life expectancy] should occur in 'exceptional cases.'" Estate of Carter Through Taggert v. United States, 921 F.2d 63, 67↩ (5th Cir. 1991).
21. Given contemporary advances in medicine and the ability to sustain life, we recognize that it is increasingly difficult to predict actual life expectancy with a high degree of certainty. We respect Dr. Fleischman's candor in admitting that Gordon's death could not be predicted with "absolute certainty". However, when a disease has progressed to such an extent as was present in the instant case, it becomes evident to those familiar with the physical condition of the patient that a cure cannot be expected and that death will inevitably follow.↩
22. As discussed in more detail below, the private annuity agreement includes a provision allowing for an adjustment to the amount to be paid to Gordon should the Internal Revenue Service or this Court determine a higher value for the remainder interest. We have observed in the past that such provisions allow for a reasonable inference that the transaction was not conducted at arm's length. Harwood v. Commissioner, 82 T.C. 239, 271 n.23 (1984), affd. without published opinion 786 F.2d 1174↩ (9th Cir. 1986).
23. We observed in Ward v. Commissioner, 87 T.C. 78, 113 (1986), that unlike the unified transfer tax system that is in effect today, Commissioner v. Procter, 142 F.2d 824↩ (4th Cir. 1944), revg. on other grounds a Memorandum Opinion of this Court, was decided at a time when Federal gift and estate taxes were treated as separate taxes, each with its own rate schedule.
24. Gradow v. United States, 11 Cl. Ct. 808 (1987), affd. 897 F.2d 516↩ (Fed. Cir. 1990), has been the subject of much debate among legal commentators. Compare Dodge, 50-5th T.M., Transfers with Retained Interests and Powers, A-67 (1992) with 2 Casner, Estate Planning, sec. 6.15.2 n.6 (5th ed. 1985 & Supp. 1992).
25. It appears that a similar issue arose in Estate of De Foucaucourt v. Commissioner, 62 T.C. 485, 491↩ (1974), yet the taxpayer in that case did not contest the Commissioner's determination.
26. As previously discussed, supra pp. 72-77, the adjustment clause included in the private annuity agreement is of no effect and will not affect our holding with respect to the amount of the offset that petitioner is entitled to under sec. 2043(a)↩.